**IN AND FOR THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INTERNET MEDIA CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-633 (KAJ) |
| | ) | |
| DELL, INC., OFFICE DEPOT, INC., | ) | |
| J.C. PENNEY COMPANY, INC., | ) | **JURY TRIAL** |
| WILLIAMS-SONOMA, INC., and | ) | **DEMANDED** |
| J. CREW GROUP, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS DELL, INC.'S, J.C. PENNEY CO. INC.'S,
WILLIAMS-SONOMA, INC.'S AND J. CREW GROUP, INC.'S
<u>OPENING CLAIM CONSTRUCTION BRIEF</u>**

Richard L. Horwitz (2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE  19899
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

OF COUNSEL:

David E. Killough
Matthew S. Wermager
VINSON & ELKINS L.L.P.
2801 Via Fortuna, Suite 100
Austin, Texas 78746-7568
Tel:  (512) 542-8400

*Attorneys for Defendant
Dell Inc.*

Dated:  July 5, 2006

Philip A. Rovner (3215)
POTTER ANDERSON & CORROON LLP
Hercules Plaza 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE  19899
(302) 984-6000
provner@potteranderson.com

OF COUNSEL:

James G. Gilliland, Jr.
April E. Abele
Matthew R. Hulse
TOWNSEND AND TOWNSEND
     AND CREW LLP
Two Embarcadero Center, 8th Floor
San Francisco, California 94111
Tel:  (415) 576-0200

*Attorneys for Defendants
J.C. Penney Company, Inc.,
Williams-Sonoma, Inc. and
J. Crew Group, Inc.*

## Table of Contents

Page(s)

I.  INTRODUCTION ...................................................................................................1

    A.  The `835 Patent .........................................................................................1

    B.  Claim Construction....................................................................................4

II. PROPOSED CONSTRUCTIONS OF THE CLAIMS OF THE `835 PATENT ...........6

    A.  A Published Compilation of Preselected Internet Locations ............................6

        1.  "Published" Means Publicly Accessible. .......................................7

        2.  The "Published Compilation" is a List. .........................................7

        3.  "Internet locations" in the "published compilation" are URLs. .......................8

        4.  The Published Compilation Must Include Existing URLs Associated with More Than One Person or Entity. .........................................14

    B.  A "Multi-Digit Jump Code" is a Number Having More Than One Digit. ...................................................................................................15

    C.  Predetermined Published Internet Location ...................................................18

        1.  Predetermined Published Internet Location ...................................................19

        2.  The Predetermined Published Internet Location Must Provide Access To Other Places On The Internet Associated With Other Persons or Entities. ...................................................23

III. CONCLUSION ...................................................................................................24

<u>TABLE OF AUTHORITIES</u>

**Cases**                                                                        **Page(s)**

*Ekchian v. The Home Depot, Inc.*,
   104 F.3d 1299 (Fed. Cir. 1997) ...........................................................................14, 17

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
   192 F.3d 973 (Fed. Cir. 1999) ...............................................................................5, 16

*EMI Group North America, Inc. v. Cypress Semiconductor Corp.*,
   68 F. Supp. 2d 421 (D. Del. 1999), *rev'd-in-part on other grounds*,
   268 F.3d 1342 (Fed. Cir. 2001) ..................................................................................20

*Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.*,
   279 F.3d 1022 (Fed. Cir. 2002) ..................................................................................20

*Hoechst Celanese Corp. v. BP Chemicals Ltd.*,
   78 F.3d 1575, 38 U.S.P.Q.2d 1126 (Fed. Cir. 1996) ..................................................21

*Honeywell Int'l, Inc. v. ITT Industries, Inc.*,
   2006 WL 1703376 (Fed. Cir. June 22, 2006) ........................................................7, 8

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004) ....................................................................................5

*Int'l Rectifier Corp. v. IXYS Corp.*,
   361 F.3d 1363 (Fed. Cir. 2004) ....................................................................................5

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)............................................5

*Metabolite Labs, Inc. v. Lab. Corp. of Am. Holdings*,
   370 F.3d 1354 (Fed. Cir. 2004) ..................................................................................13

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
   133 F.3d 1473, 45 U.S.P.Q.2d 1429 (Fed. Cir. 1998) ................................................21

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ........................................................................5, 6, 21

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
   182 F.3d 1298 (Fed. Cir. 1999) ..................................................................................20

*Southwall Techs., Inc. v. Cardinal IG Co.*,
   54 F.3d 1570 (Fed. Cir. 1995) ....................................................................................15

*Tegal Corp. v. Tokyo Electron America, Inc.*,
   257 F.3d 1331 (Fed. Cir. 2001) ..................................................................................17

*Vitronics Corp. v. Conceptronics, Inc.*
   90 F.3d 1576 (Fed. Cir. 1996)) ...................................................................................5

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
   442 F.3d 1322 (Fed. Cir. 2006) ..................................................................................19

**EXHIBIT LIST**

**EXHIBIT 1**       The `835 patent

**EXHIBIT 2**       Excerpts from the `835 patent's file history

**EXHIBIT 3**       Defendants' claim construction chart[1]

**EXHIBIT 4**       `835 specification excerpts referring to "locations"

**EXHIBIT 5**       Excerpts from *What's on the Web*

**EXHIBIT 6**       `835 specification excerpts referring to "jump codes"

**EXHIBIT 7**       Excerpts from *Webster's Ninth New Collegiate Dictionary* (1995)

**EXHIBIT 8**       Excerpts from *Barron's Dictionary of Computer and Internet Terms* (1996)

**EXHIBIT 9**       *Honeywell Int'l, Inc. v. ITT Industries, Inc.*, 2006 WL 1703376 (Fed. Cir. June 22, 2006)

---

[1] The claim construction chart contains the constructions of the Defendants other than Office Depot.

## I.    INTRODUCTION[2]

### A.    The `835 Patent

In August of 1996, Plaintiff Internet Media Corporation ("IMC") filed the patent application which ultimately led to the patent here at issue, U.S. Patent No. 6,049,835 ("the `835 patent"), entitled:  SYSTEM FOR PROVIDING EASY ACCESS TO THE WORLD WIDE WEB UTILIZING A PUBLISHED LIST OF PRESELECTED INTERNET LOCATIONS TOGETHER WITH THEIR UNIQUE MULTI-DIGIT JUMP CODES.[3]

By the time IMC filed its patent application, the Internet had already developed into a mighty resource, providing users access to thousands upon thousands of files located on computers around the world connected together in an enormous network.  The basic concept of the Internet – *i.e.*, allowing navigation to files residing on other computers connected to the Internet – was and is really quite simple; that is, assign the location of each of those files a unique address identifying that file's location somewhere on someone's computer connected to the Internet.  Such unique addresses were christened "URLs," an acronym for "Universal Resource Locators,"[4] a term more completely defined later in this brief.

---

[2] The term "Defendants," as used herein, refers to Dell, J.C. Penney, Williams Sonoma and J. Crew.  While it is anticipated that Office Depot will be joining in the majority of these Defendants' constructions, Office Depot is proffering its own construction for the phrase "a published [publishing a ] compilation of preselected Internet locations" and will be filing its own brief addressing that phrase.

[3] For the Court's convenience, a copy of the `835 patent and relevant excerpts from the file history of the `835 patent are attached hereto as Exs. 1 and 2 respectively.  Also for the Court's convenience, Defendants have reproduced as Ex. 3 the claims at issue (with disputed terms highlighted) and Defendants' corresponding proposed claim constructions.

[4] URL has also been referred to as a "Uniform Resource Locator."

As the number of URLs increased exponentially in the mid 1990's, URLs grew more complex. Memorizing the URLs of all desired Internet locations was impractical and manually entering URLs into an Internet browser was error prone and viewed by some as a cumbersome task. Also, there was the frustration associated with finding useful websites since many did not offer "any truly useful information or other benefits." (Ex. 1, 3:66-4:1.)

According to IMC, the perceived deficiencies of prior methods of navigating the Internet evidenced "a need for a system which the Web user can use to access Web sites which contain a substantial amount of original information, graphics, or multi-media, provide useful advice, news or entertainment, and present the information in a well-thought out and professional manner." (*Id.*, 4:15-22.) "Most importantly" there was "a great need to provide Web users with a system for accessing such Web pages in an easy to use, automatic, and efficient manner." (*Id.*)

IMC's system was an attempt to simplify navigation to places of interest on the Internet. The `835 patent's alleged invention was to publish a book listing the URLs for the locations of Internet files of interest and assigning to each a unique number. A user could then access a companion site on the Internet, enter one of the numbers and automatically access the corresponding Internet location.

More specifically, the main embodiment of the `835 patent, a book, called *What's on the Web* and published by IMC, published the URLs of web sites together with a unique number, or "jump code," assigned to each web site. (Ex. 1, 5:50-61.) An excerpt from the 1995-96 version of the book is reproduced below.

2



As shown in this excerpt from *What's on the Web*, the publication includes:  a review of the website (in this case, the Federal Express site), the URL (http://www.fedex.com) and the four-digit jump code (7112) corresponding to the URL.

The book also included the URL for the companion web site, called "Jump City": http://www.jumpcity.com/, such that a user can locate a desired website in the book, determine the appropriate code corresponding to that website and use the companion JumpCity website to automatically access the desired website (*Id.*, 5:37-44):

> A user desiring to access one of the preselected websites first gains access to the World Wide Web, using a Web browser, by accessing a special Web site [*e.g.*, JumpCity at  http://www.jumpcity.com/] which contains software for receiving any of the published four-digit jump codes and, based upon the stored relationship of the URLs corresponding to the input jump code, directly accesses the Web site corresponding to the jump code inputted by the user.  (Ex. 1, 4:57-65.)

A schematic illustrating how the JumpCity website operates in conjunction with *What's on the Web* is shown below.

3



*What's on the Web* is designated by reference numeral 110, above, and the JumpCity website is designated by reference numeral 108. The JumpCity website is accessed through a personal computer 100. Taking the website located at http://www.fedex.com by way of example, the user enters Federal Express's jump code into the JumpCity website, and a software program in JumpCity then "searches through its database of URLs, and finds the URL which is linked to the input jump code. The software then links the user either directly to the desired Web site, or alternatively, first to a brief written review of the Web site." (*Id.*, 6:56-7:10.)

Thus, a user may, through the use of simple numerical jump codes and the JumpCity web site, access web sites of interest whose URLs are listed in *What's on the Web* without having to key in their URLs. (*Id.*, 7:10-19.)

**B.    *Claim Construction***

Analysis begins with the language of the claim itself, including the context in which individual terms appear because "it is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which a patentee is entitled the right to

4

exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citing *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)). The context of the surrounding claim language often determines the meaning of the claim. "Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314.

The Court, however, must always consider the claim language in the context of the patent specification. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)  ("Claims must be read in view of the specification, of which they are a part."). As the Federal Circuit recently reaffirmed *en banc*, "the specification 'is the single best guide to the meaning of a disputed term.'" *Phillips,* 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronics, Inc.* 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

Like the patent specification, the prosecution history forms part of the intrinsic record and should be consulted in every case. *Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1370 (Fed. Cir. 2004); *see also Phillips,* 415 F.3d at 1317 (*citing Markman*, 52 F.3d at 980). In particular, statements that disclaim a particular reading of the claim language in order to obtain allowance serve to limit claim scope. *See Phillips,* 415 F.3d at 1317*; see also Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 978 (Fed. Cir. 1999).

The Court may also rely on extrinsic evidence, which is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. In particular, "judges are free to consult dictionaries and technical treatises at any time in order to better understand the underlying technology and. . .when construing claim terms, so long as the dictionary

definition does not contradict any definition found in or ascertained by a reading of the patent documents. *Phillips,* 415 F.3d at 1322-23.

## II. PROPOSED CONSTRUCTIONS OF THE CLAIMS OF THE `835 PATENT

### A. *A Published Compilation of Preselected Internet Locations*

| Claim 1 | Defendants' Construction | Internet Media's Construction | Office Depot's Construction |
|---|---|---|---|
| **a published compilation of preselected Internet locations**, | a publicly accessible list of different URLs associated with more than one person or entity, each URL corresponding to a different preselected place on the Internet | disseminated collection of information, such as descriptions, text or graphics, at least some of which correspond to preselected identified material or subject matter that is provided via the internet by one or more computers | a publicly accessible preselected list of pre-existing Websites and other pre-existing Internet sites having unique URL addresses, the URL addresses being associated with diverse individuals or entities. |
| Claim 11 | Defendants' Construction | Internet Media's Construction | Office Depot's Construction |
| **publishing a compilation of preselected Internet locations**, | making publicly accessible a list of different URLs associated with more than one person or entity, each URL corresponding to a different preselected place on the Internet | [no construction offered] | publishing an accessible preselected list of pre-existing Websites and other pre-existing Internet sites having unique URL addresses, the URL addresses being associated with diverse individuals or entities. |

The first elements of claims 1 and 11 refer to "a published" or "publishing a" "compilation of preselected Internet locations." The Defendants' position that "published" means "publicly accessible," that the compilation is a "list" and that the list contains URLs is the only position that is fully supported by the intrinsic record. Further, the prosecution history requires that the URLs be associated with more than one person or entity and that each URL correspond to a different preselected place on the Internet.

Office Depot joins in Defendants' construction of "published" and "compilation" and agrees that the "Internet locations" must correspond to different places on the Internet, but incorrectly construes the term "Internet location" as used in context in this claim element.   Worse, IMC's construction completely disregards the intrinsic record and prosecution history.

### 1.   *"Published" Means Publicly Accessible.*

The term "published," as used in the specification and claims, means "publicly accessible" as opposed to "disseminated" as IMC urges.   The claim is referring to the publication where an Internet user can find jump codes matched to URLs, and encompasses not only a printed publication (*e.g.*, *What's on the Web*, *see also*, dependent claims 6 and 16), but also an "on-line list" (such as "an on-line list within the JumpCity Web site" (Ex. 1, 7:63-65)).   A on-line list on a web site is not "disseminated," but is "published" by making it publicly accessible.[5]

### 2.   *The "Published Compilation" is a List.*

"The system of the present invention utilizes a published list of preselected Web sites."  (Ex. 1, 4:54-55.)  The Federal Circuit has held that statements like this, where the patentee tells the public what the "invention" is, define the scope of the claims. *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 2006 WL 1703376, *6 (Fed. Cir. June 22, 2006) (Ex. 9 hereto).  In *Honeywell*, the Federal Circuit held that, because the patentee had

---

[5] This also is consistent with IMC's use of the term "published" as it appears elsewhere in the claims.  For instance, later in claim 1, and as discussed in further detail below, the claims also require that a "predetermined Internet location" (not to be confused with the "preselected Internet locations" in this element) be published.   As discussed later below, a "predetermined Internet location" (as opposed to a "preselected Internet location" contained in a compilation) is a place where an actual file resides.  Here, again, "published" must mean publicly accessible, it cannot mean "disseminated" because the actual place where a file resides cannot be disseminated.

referred to the fuel filter as "this invention" or " the present invention," the "public is entitled to take the patentee at his word and the word was that the invention is a fuel filter." *Id*. IMC stated in the specification that its "invention utilizes" "a list of preselected Web sites;" the claims should be construed accordingly.[6]

IMC, nonetheless, urges this Court to interpret "compilation" as a "collection." Not only is "collection" never used in the specification to refer to the published compilation, but such a construction ignores the definition provided by IMC itself, *i.e.*, that the compilation is a "list." Defendants' construction is the only construction that is intrinsically supported and is, therefore, the correct construction.

### 3.  *"Internet locations" in the "published compilation" are URLs.*

The non-Office Depot Defendants ask that the Court construe the term "Internet location" in the phrase a "compilation of preselected Internet locations" to mean "URLs."

---

[6] IMC's use of "list" to refer to the published compilation can be found throughout the specification. The title of `835 patent is: "System for providing easy access to the World Wide Web utilizing a published *list* of preselected Internet locations together with their unique multi-digit jump codes." (Emphasis added.) The abstract similarly discloses that the system of the invention uses "a published *list* of Internet or World Wide Web sites together with their unique jump codes." (Emphasis added.) The preferred embodiment states that: "[a] *listing* of such newsgroups together with their assigned jump codes can be accomplished in a manner similar to that for the Web sites," (Ex. 1, 6:8-10 (emphasis added)), and that "[I]n all other respects, accessing the desired Web site as published in the book or printed publication 110 or as published as an on-line *list* within the JumpCity Web site 108, is the same as described above in connection with Fig. 1." (*Id*., 7:63-66 (emphasis added).) The prosecution history also supports defining "compilation" as "list." During prosecution, the Examiner conducted an interview to discuss prior art references with IMC. In summarizing that interview, IMC stated that the Examiner's position was that one of the references taught "listing numerical codes (UPC's) with URL's and that the known Internet directories provide motivation to print out the databases." In overcoming that rejection, IMC never once quarreled with the Examiner's characterization of the compilation as a "list." (Ex. 2, IMC_PLTF 061832-33.)

The specification makes many references to "locations" on the Internet. Every use of the word "location," or variant thereof, in the specification is reproduced in Ex. 4 hereto. As is evident from the excerpts from the `835 specification in Exhibit 4, the word "location" is used in the specification in two different senses depending on context. When referring to a "location," IMC sometimes used the term to mean the <u>actual physical location</u>, *i.e.*, place, where an electronic file resides on a computer connected to the Internet. Other times IMC referred to a "location" as the <u>URL</u> (*i.e.*, address) of the actual physical location where that electronic file resides. (*See* Ex. 4.)

Just as in the specification, the key to construing the term "Internet location" in the claims is to focus on the context in which the term is used. In the first claim element, it makes no sense to say – nor is it possible – that the thing published in a "compilation," such as the book *What's on the Web*, is an actual physical location on the Internet. In contrast, it makes perfect sense to say that the thing published in the compilation is the URL, *i.e.*, address, of a physical location on the Internet. Construing the phrase "a published compilation of preselected Internet locations" as "a publicly accessible list of different URLs, each URL corresponding to a different preselected place on the Internet" is fully supported, indeed required, by the claim language, specification and prosecution history.

The specification states that "[e]very web site has an exact address, or *location* on the Web. Such addresses are known as a Uniform Resource Locator or URL." (Ex. 1, 3:53-55.) In this context, "location" plainly means the *address* of the physical location of a web site, not the physical location itself.

Other passages in the specification also use the term "location" when referring to a "URL." For example, in describing the process of bookmarking a website, the specification explains that "[w]eb browsers also have a bookmark or hot list feature,

which allows the user to capture and save the *location* of any Web site that is visited, so that such sites can be readily reaccessed by clicking on it from the user's Web browser at any time." (*Id.*, 3:12-16 (emphasis added).) The "location" the Web browser is capturing and saving is necessarily the URL of the desired website; "location" cannot mean anything else in this context.

IMC's statements to the PTO that its invention involved publishing a compilation of "electronic addresses" further supports Defendants' construction that the claimed published compilation is a list of URLs. During prosecution, the PTO cited many references that disclosed methods for navigating to pages on the Internet. One reference, Patent No. 5,764,906 ("the Edelstein patent") attempted to resolve the same problem as addressed by the `835 patent – that URLs are cumbersome. The Edelstein patent's solution was to use in advertisements mnemonic alpha or alphanumeric aliases for a particular company's URLs (*e.g.* using "IBM" to represent the IBM website) coupled with a system for recognizing those aliases and translating them into their corresponding URLs. To overcome this reference, IMC emphasized that the claimed "compilation," in contrast to an advertisement focusing on a single company as addressed in the Edelstein patent, requires that more "electronic addresses," *i.e.*, URLs, than just those relating to one company be listed:

> [W]hile Edelstein et al. proposes that information providers advertise the <u>electronic addresses of their resources</u>, it does not follow that information providers would have been motivated to <u>publish a compilation, which would almost certainly include the electronic addresses</u> of their competitors' resources. Instead, the advertisement taught by Edelstein et al. would take the form of an advertisement for a single company with the <u>electronic address</u> of that company's resource….Therefore…Edelstein et al. teaches away from the present claimed invention….

(Ex. 2, IMC_PLTF 061834 (emphases added).) IMC thus confirmed that what is being listed in the "compilation" is electronic addresses, *i.e.*, URLs, and, indeed, as will be

discussed further below, that the URLs compiled must relate to more than one person or entity.

Later in prosecution, IMC again confirmed that a "published compilation of Internet locations" was a list of URLs. IMC was faced with an obviousness rejection based on the Edelstein patent and Patent No. 5,804,803 ("the Cragun patent"). The Cragun patent describes a system for scanning the UPC (a number) of a product and translating this number into a URL corresponding to the scanned product. In rejecting IMC's claims, the Examiner observed that the database of the Cragun patent that listed UPCs and corresponding URLs, or the database of the Edelstein patent, could be printed out and published, thus constituting the claimed "compilation." In a summary of an interview with the Examiner regarding this rejection, IMC never questioned the Examiner's stance that the claimed "compilation" is a list of codes and <u>URLs</u>:

> The examiner took the position that the database of either Edelstein et al or Cragun et al could be printed out and used as a published compilation, that Cragun et al teaches listing numerical codes (UPC's) with URL's and that the known Internet directories provide motivation to print out the databases.
>
> The applicant's representative responded as follows. First, it would not have been possible, much less obvious for a user to gain access to the database of Edelstein et al or Cragun et al. Second, Cragun et al is specifically intended for use in a store, where a user can take a can of chicken soup to the bar-code scanner of the client computer and scan in the UPC bar code to access the Web site of the manufacturer of the soup. By contrast, the published compilation of the present invention is usable from any computer with Internet access, e.g., a home computer, and is not limited to use with products bearing UPC codes. Third, it would not have been obvious to combine either Edelstein et al or Cragun et al with a published Internet directory. Edelstein et al teaches away from the use of published compilations depending on mnemonic codes instead. Cragun et al relies on the UPC bar codes on the packaging of actual products, with the result that a published compilation would have been superfluous.

(*Id.*, IMC_PLTF 061832-33.) None of IMC's three arguments to distinguish over the art state that the compilation is not a list of URLs paired with codes, but rather: (i) that the compilations are not publicly accessible; (ii) that the invention of the Cragun

patent is not available at a user's home, and (iii) that there is no motivation to combine the references with Internet directories. IMC never questioned the Examiner's characterization that the claimed "compilation" is a list of URLs coupled with codes because that was its alleged invention. Indeed, IMC even amended the title of the invention from "System for providing easy access to the world wide web" to "System for providing easy access to the world wide web *utilizing a published list of preselected Internet locations together with their unique multi-digit jump codes*" (emphasis added). (*Id.*, IMC_PLTF 061804.)

IMC's use of the term "location" in the `835 patent to refer to an electronic address of a file is also consistent with every day use of the term "location." Compare, for example, IMC's use of "Internet location" with how we often refer to the "location" of a house. Strictly speaking, a house's location is the actual land on which it sits, the space it occupies. However, if someone asks someone else what the "location" of his or her house is, the usual reply would be to state a street address. Likewise, in order to *publish* the "location" of a house—*e.g.*, in a phone book—the street address of the house is used. Just as a published compilation of house locations, *e.g.*, a phone book, is a published compilation of street addresses, a published compilation of Internet locations, *e.g.*, *What's on the Web*, is a published compilation of URLs. (Exemplar excerpts from *What's on the Web* are attached as Ex. 5 hereto.)

Unlike Defendants' construction, IMC's construction is unintelligible; it urges the court to equate "Internet locations" with "identified material or subject matter that is provided via the internet by one or more computers." First, as discussed above, while "location" is used in two different senses depending on context throughout the specification, neither of these uses is adopted by IMC in its construction, and to say that an Internet location is merely "material or subject matter" is contrary to both logic and the specification. Second, IMC has read out an affirmative requirement of the claim, that

12

the compilation contain "Internet locations."  In IMC's construction, only "some" of the "information" has to correspond with the preselected Internet locations, meaning that some of the information may correspond to something else.  Whatever that something else is, it surely isn't supported by the specification or the claim language itself, and such an interpretation is impermissible.  *See Metabolite Labs, Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1374 (Fed. Cir. 2004) ("courts can neither broaden nor narrow claims to give the patentee something different than what he has set forth.").

IMC's attempt to re-draft the claims is equally apparent when its separate construction of "Internet location" is inserted into its construction of the rest of the "published compilation" element.  Specifically, the entire construction would read as follows:  "a disseminated collection of information, such as descriptions, text or graphics, at least some of which correspond to identified material or subject matter that is provided via the internet by one or more computers."  Thus, when read in context, IMC's construction boils down to some publicly accessible "information" in a collection corresponding to "information" on one or more computers connected to the Internet.  Such an arbitrary and amorphous definition must be rejected.

Likewise, while Office Depot agrees with the other Defendants that "published" means "publicly accessible," and that a "compilation" is a "list," its construction of "Internet location" begs the question:  What exactly is being compiled?  Office Depot asserts that the list contains "Websites or other pre-existing Internet sites having unique URL addresses" but neglects to state clearly what it is that is actually compiled on the list.  Is Office Depot asserting that it is the actual physical places where files reside that are somehow listed in a printed publication?  Certainly that's not possible.  Office Depot also  seems to question the other Defendants' position that it is the URLs of those places on the Internet that are compiled.  Office Depot's construction, to the extent it varies

from the other Defendants, should be dismissed along with IMC's erroneous construction.

### 4. *The Published Compilation Must Include Existing URLs Associated with More Than One Person or Entity.*

One of the novel features of the invention, according to IMC, is that it provides access to any and all web sites of interest on the Internet, not merely pages within one web site. In describing the prior art, IMC stated in response to an office action that "the system described in the Levergood et al. patent is directed to…merely sub-links within a merchant's own website which is operated on the 'single merchant server.'" (Ex. 2, IMC_PLTF 061791.) In distinguishing over this art, IMC stated "[a]pplicant's invention provides Internet users with the ability to reach any and all Internet locations on any of the servers connected to the Internet, as opposed to the single merchant server utilized by the Levergood et al. system" (*Id.*(emphasis added).) This requirement is further supported by the excerpt cited above where IMC argued that Edelstein et al., whose system was directed to individual advertisers, would not motivate the issuing of a published compilation that "would almost certainly include the electronic addresses of their competitors' resources" as opposed to just the electronic addresses of one company. (*Id.*, IMC_PLTF 061834 (emphasis added).)

Because IMC has disclaimed protection for systems which allow navigation solely within URLs associated with a single merchant, the claims must be construed to require that the preselected Internet locations include URLs associated with more than one person or entity. S*ee, e.g., Ekchian v. The Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997) ("by distinguishing between the invention and the prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection."); *Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed. Cir.

1995) ("the prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.").

Accordingly, the non-Office Depot Defendants' construction – a publicly accessible list of different URLs associated with more than one person or entity, each URL corresponding to a different preselected place on the Internet – is the correct construction.

### B.  A "Multi-Digit Jump Code" Is A Number Having More Than One Digit.

| Claim 1 and 11 | Defendants' Construction | IMC's Construction |
| --- | --- | --- |
| said published compilation including a **unique predetermined multi-digit jump code** assigned to each of said preselected Internet locations published therein; | different predetermined number consisting of more than one digit | unique predetermined code consisting of more than one digit used to access an Internet location |

Defendants, relying on the claim language, the specification, explicit statements in the prosecution history and plain English, construe the term "multi-digit jump code" to mean a "number consisting of more than one digit."  In stark contrast, IMC ignores the intrinsic record and does not really provide any construction for the term at all.

When IMC first filed its patent application for the eventual `835 patent, it claimed that each of the preselected Internet locations in the published compilation had a "unique predetermined jump code published therewith."  (Ex. 2, IMC_PLTF 061501.)  But, when forced to distinguish over the prior art during prosecution, IMC explicitly defined its "jump codes" as "numbers" and actually amended its claims to recite "*multi-digit jump code*" to reflect this distinction.  IMC's statements, shown below, were designed and

intended to obtain allowance of the patent and, as such, serve to limit scope of the claim. *See Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 978 (Fed. Cir. 1999).

IMC was forced to distinguish over a reference which, according to the Examiner, taught that a user could "obtain the unique predetermined jump code of locations on the Internet (telephone number or company name or product name . . .) through advertising." (Ex. 2, IMC_PLTF 061690.)  IMC distinguished its invention by stating "[a]pplicant's jump code is an uniquely predetermined ***number*** which is published together with the published compilation of preselection [sic] locations on the Internet"  (*Id.*, IMC_PLTF 061792(emphasis added).)   Since IMC viewed this statement as dispensing with the "company name" or "product name" categories of codes disclosed in the prior art, it only responded to the "telephone numbers" category of codes and argued that the telephone numbers in the reference were neither predetermined nor published. (*Id.*)  Tellingly, IMC subsequently amended the term "jump code" to "multi-digit jump code" to even more clearly require that the claimed codes be a number.  (*Id.*, IMC_PLTF 061804-12.)

Later in prosecution, IMC was forced to overcome the Edelstein patent discussed above.  Again, that reference assigned mnemonic aliases (such as "U.S. Senate" or "Senator Dole" or "Boeing/767 Info" – *i.e.*, a string of alpha or alphanumeric characters) to URLs, each alias also being assigned a serial number.  IMC argued that even if the mnemonic aliases were published in a compilation, "such a published compilation would still not include a multi-digit jump code assigned to each of the preselected Internet locations" because "the user does not see the serial number [assigned to each alias]."  (*Id.* 2, IMC_PLTF 061833-35 (emphasis added); U.S. Patent No. 5,764,906, Col. 5, lines 3-31.)  IMC was asserting that a reference could not anticipate or be used to render obvious the system of the invention unless it published numbers and it obtained allowance of the claims on that basis.  Accordingly, the claims again must be construed as restricted to that

meaning.  *See, e.g., Ekchian v. The Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997).

Defendants' construction also is supported by the claims themselves. Significantly, dependent claim 9 [and dependent claim 19] claims:  "The system of claim 1 [claim 11], wherein said multi-digit jump code is a four digit <u>number</u>."  The fact that claims 9 and 19 state that the "multi-digit jump code" of claims 1 and 11 can be a four digit ***number*** is consistent with construing "multi-digit jump code" as "a number having more than one digit."  Moreover, while the specification recites several times the phrase "four digit jump code," the specification ***never*** calls the "four digit jump code" a quote-unquote "number" as recited in claims 9 and 19.  Thus, for claims 9 and 19 – which were added to the patent application by amendment after the original application was filed – to find support in the specification, the "multi-digit jump code" ***must*** be a "number."  37 CFR 1.75(d)(1) ("[T]he terms and phrases used in the claims must find clear support or antecedent basis in the description so that the meaning of the terms in the claims may be ascertainable by reference to the description."); *see also*, *Tegal Corp. v. Tokyo Electron America, Inc.*, 257 F.3d 1331, 1345 (Fed. Cir. 2001) (the claim term "glow discharge" was not used in the specification, but the prosecution history equated the term with another claim term, "plasma" and therefore the two terms should be construed synonymously.)

All of the remaining references in the patent specification to any of the words in the phrase "multi-digit jump code" – all of which are reproduced in Ex. 6 hereto – are also fully consistent with the requirement that the claimed "multi-digit jump code" be a number having more than one digit.  In fact, the only "multi-digit jump codes" in the book *What's on the Web* referenced in the specification are numbers having more than one digit.  (*See* Ex. 5.)

17

Of course, the requirement that a "multi-digit jump code" be a number having more than one digit also accords with the dictionary meaning of "multi" ("more than one") and "digit" ("any of the Arabic numerals 1 to 9 and usu. the symbol 0"). *Webster's Ninth New Collegiate Dictionary*, pp. 354, 779 (1985), Ex. 7 hereto.

The evidence that a "multi-digit jump code" must be a number having more than one digit is overwhelming. In stark contrast, IMC's proposed construction of "unique predetermined multi-digit jump code" – *i.e.*, "unique predetermined code consisting of more than one digit" – merely rephrases the claim language. Moreover, IMC's construction gives no weight whatsoever either to the plain-English definition or to the intrinsic record. IMC's apparent plan is to avoid the issue and hand off the construction of the term to the jury. The Court should reject IMC's attempt to ignore the intrinsic record and should adopt Defendants' construction.

### C. *Predetermined Published Internet Location*

| Claim 1 | Defendants' Construction | IMC's Construction |
|---|---|---|
| a **predetermined published Internet location having an address published in said published compilation**, | a publicly accessible predetermined place on the Internet having a URL published in said published compilation and providing access to other places on the Internet associated with other persons or entities | predetermined Internet location having an designation for a particular Internet location published in said published compilation |
| Claim 11 | Defendants' Construction | IMC's Construction |
| **providing a predetermined Internet location having an address** | providing a publicly accessible predetermined place on the Internet having a URL published in said published compilation and providing access to other places | no construction offered |

18

| Claim 1 | Defendants' Construction | IMC's Construction |
|---|---|---|
| **published in said published compilation,** | on the Internet associated with other persons or entities | |

### 1. *Predetermined Published Internet Location*

Claims 1 and 11 require that the claimed "predetermined Internet location" referred to in this element (and as distinct from the "preselected Internet locations" referred to in the first claim element) have certain functionality embodied in software resident at this "Internet location," *e.g.*, "capturing," "receiving" and "converting" the jump code:

> … said predetermined published Internet location including means for capturing a desired multi-digit jump code … means for receiving said desired multi-digit jump code from said means for capturing and means for converting said received multi-digit jump code to a URL … (Claim 1.)

> … said predetermined Internet location comprising means for capturing a desired multi-digit jump code … receiving said multi-digit jump code after said multi-digit jump code has been entered … converting the received multi-digit jump code to a URL … (Claim 11.)

In this context, the predetermined "Internet location" must be a physical location on a computer on the Internet and not the URL for such a location. That the claims initially use the term "Internet location" when referring to a URL and then here use the term to refer to a physical place on the Internet is of no moment; the same terms may be used in different contexts in a claim and so have different meanings depending on those contexts.[7]

---

[7] *See, e.g.*, *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1327-28 (Fed. Cir. 2006) ("'gap' in claims 1 and 15 – should have the same meaning 'unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims'"; instances in the claims where the term "gap" appeared with the word "annular" warranted different constructions of the word "gap" in different portions of the claims); *Epcon Gas Systems, Inc. v. Bauer*

The specification makes clear that the term "location" sometimes, as in this element, refers to the actual physical location of the files that make up a web site: "A web site is basically a collection of files *located* on a directory somewhere on someone's computer connected to the Internet." (*Id.*, 3:31-34 (emphasis added).) It is necessary to pay particular attention to what is actually being published, *i.e.*, made publicly accessible. In this case, it is not a "compilation of Internet locations" (with URLs being the only thing that can be compiled), rather it is a physical "location" publicly accessible on the Internet having executable software. This usage of "location" in this context finds ample support in the specification and prosecution history:

> The present invention is directed to a system for providing users of the Internet with easy access to the World Wide Web. More particularly, the present invention is directed to providing a central <u>location</u> which World Wide Web users of the Internet can reach and can then instruct to provide them with ready access to a particular *location* on the World Wide Web portion of the Internet.

(*Id.*, 1:10-14 (emphases added).) "Any single Web site may contain dozens, hundreds, or even thousands of hot links, both to other sections within the same site or to other Web sites *located* anywhere else in the world." (*Id.*, 3:45-48 (emphasis added).) "Applicant's invention provides Internet users with the ability to reach any and all Internet <u>locations</u> on any of the servers connected to the Internet." (Ex. 2, IMC_PLTF 061791(emphasis added).)

---

*Compressors, Inc.*, 279 F.3d 1022, 1031 (Fed. Cir. 2002) (finding that the term "substantially" was used in two different contexts in the specification and must therefore be construed according to different contexts in the claims); *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1311 (Fed. Cir. 1999) ("where the language of the written description is sufficient to put a reader on notice of the different uses of a term, and where those uses are further apparent from publicly available documents referenced in the patent file, it is appropriate to depart from the normal rule of construing seemingly identical terms in the same manner. … [T]he terms ["spot"] must be read to correspond to the only plausible meaning in each context."); *EMI Group North America, Inc. v. Cypress Semiconductor Corp.*, 68 F. Supp. 2d 421, 431-32 (D. Del. 1999), *rev'd-in-part on other grounds*, 268 F.3d 1342 (Fed. Cir. 2001) (in the claims the word "metal" in one context included alloys and in another context excluded alloys).

At least with regard to the first portion of Defendants' construction, IMC's construction differs only slightly as it would urge the court to use the term "designation" in place of Defendants' term "URL." However, the specification requires otherwise. The claim term "address" as well as all of the terms in claims, "must be construed as it would be understood by persons knowledgeable in the field of the invention." *Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1478, 45 U.S.P.Q.2d 1429, 1433 (Fed. Cir. 1998); *Hoechst Celanese Corp. v. BP Chemicals Ltd.,* 78 F.3d 1575, 1578, 38 U.S.P.Q.2d 1126, 1129 (Fed. Cir. 1996). Here the term "address" is a technical term and must be accorded its ordinary definition in the field. *Id.* The specification provides that definition: "[e]very web site has an exact address, or location on the Web. Such addresses are known as a Uniform Resource Locator or URL." (Ex. 1, 3:53-55.) Because the term "address" is specifically defined in the patent specification as a URL, "the inventor's lexicography governs." *Phillips,* 415 F.3d at 1316

In fact, the specification requires that it is the URL of the predetermined Internet location that is published in conjunction with the published compilation:

> Once the user has connected to the Internet, he accesses the specialized Web site 108, by entering the URL for that Web site. The specialized Web site is preferably a Web site called JumpCity, which has a URL of http://www.jumpcity.com/, although, obviously a specialized Web site for use as part of the inventive system disclosed herein could have any URL (and indeed would, of necessity, have to have its own URL), *the only requirement being that the URL be disseminated in conjunction with the dissemination of the jump codes to be used therewith.*

(*Id.*, 5:37-44 (emphasis added).) Accordingly, "address" is correctly construed to mean URL.[8]

---

[8] "URL" is a technical term; URL is an acronym for "Universal Resource Locator." In 1996, those skilled in the relevant art defined a URL as:

> a way of specifying the location of publicly available information on the Internet, in the form protocol://machine:port number/filename; often the port number and/or filename is unnecessary. For example,

IMC construes the term "Internet location" the same way as in the "published compilation" elements – i.e., *identified material or subject matter that is provided via the internet by one or more computers.*  This construction lacks merit.  As discussed, the specification discloses that the "predetermined published Internet location" is a specialized website (or "place" on the Internet) into which jump codes are inputted.  (Ex. 1, 5:37-45.)  A jump code cannot be inputted into "identified material or subject matter."

If the Court were to adopt IMC's construction, other claim elements dependent upon the "predetermined Internet location" also would not make sense.  Specifically, apparatus claims 1-10 require that the predetermined Internet location include a "means for capturing" a desired jump code, a "means for receiving" the jump code from the capturing means and a "means for converting" the received jump code to a URL.  Method claims 11-20 include the same elements expressed as steps, rather than as apparatus elements.  Logically, jump codes cannot be captured, received or converted in "identified material or subject matter."  Rather, those actions can only happen in a "place" (location).  Consequently, IMC's construction of "predetermined Internet location" is illogical and should be rejected.

IMC's construction of the word "address" to mean some "designation for a particular Internet location" is equally vague, confusing, and inconsistent with the

---

http://ai.uga.edu:80/ means 'connect to port 80 of ai.uga.edu using Hypertext Transfer Protocol,' and ftp://ai.uga.edu/pub/natural.language/Contents means to download a particular file from ai.uga.edu by File Transfer Protocol.  Other possible protocols include gopher and telnet.

*Barron's Dictionary of Computer and Internet Terms*, 5th ed., 1996, Ex. 8 hereto. That definition requires that a URL contain a protocol (*e.g.*, http, ftp, telnet, etc.) followed by "://" and a machine name.  Optionally, the URL may also contain a port number and/or a filename.  This definition is entirely consistent with IMC's exemplar URL, "http://www.jumpcity.com/" and is the definition provided by those having ordinary skill in the art.  Thus, the URL of the "predetermined [published] Internet location" must conform to this definition.

intrinsic record.  As stated above, the patent expressly defines the "address" of a website as a "URL."  (Ex. 1 at 3:53-55 ("Every Web site has an exact address, or location on the Web.  Such addresses are known as a Uniform Resource Locator or URL.")).

Defendants' construction conforms with the teachings of the patent and prosecution history; IMC's does not.  As such, the Court should adopt Defendants' construction.

### 2. *The Predetermined Published Internet Location Must Provide Access To Other Places On The Internet Associated With Other Persons or Entities.*

As noted in section A2 above, IMC specifically disclaimed so called "single merchant" websites, touting the ability of the invention to access any and all locations on the Internet.  It is the predetermined Internet location that provides this utility: "[a]pplicant's invention provides Internet users with the ability to reach any and all Internet locations on any of the servers connected to the Internet, as opposed to the single merchant server utilized by the Levergood et al. system."  (Ex. 2, IMC_PLTF 061791.) As such, the proper construction of the term requires that the predetermined published Internet location access other Internet locations associated with other persons or entities, not merely of the person or entity sponsoring the predetermined Internet location.

## III.    CONCLUSION

For the foregoing reasons, Defendants' respectfully request that their proposed constructions of the disputed claim language be adopted.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

POTTER ANDERSON & CORROON LLP

By:   _/s/ David E. Moore_
    Richard L. Horwitz (2246)
    David E. Moore (#3983)
    Hercules Plaza 6th Floor
    1313 N. Market Street
    P.O. Box 951
    Wilmington, DE  19899
    (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

OF COUNSEL:

David E. Killough
Matthew S. Wermager
VINSON & ELKINS L.L.P.
2801 Via Fortuna, Suite 100
Austin, Texas 78746-7568
Tel:  (512) 542-8400

_Attorneys for Defendant_
_Dell Inc._

By:   _/s/ Philip A. Rovner_
    Philip A. Rovner (3215)
    Hercules Plaza 6th Floor
    1313 N. Market Street
    P.O. Box 951
    Wilmington, DE  19899
    (302) 984-6000
    provner@potteranderson.com

OF COUNSEL:

James G. Gilliland, Jr.
April E. Abele
Matthew R. Hulse
TOWNSEND AND TOWNSEND
    AND CREW LLP
Two Embarcadero Center, 8th Floor
San Francisco, California 94111
Tel:  (415) 576-0200

_Attorneys for Defendants_
_J.C. Penney Company, Inc.,_
_Williams-Sonoma, Inc. and_
_J. Crew Group, Inc._

Dated:  July 5, 2006

739696

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on July 5, 2006, the attached document was hand-delivered to the following persons and was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following and the document is available for viewing and downloading from CM/ECF:

Thomas P. Preston
Blank Rome LLP
Chase Manhattan Centre
1201 Market Street, Suite 800
Wilmington, Delaware 19801

Titania R. Mack
GreenbergTraurig, LLP
The Nemours Building
1007 North Orange Street
Suite 1200
Wilmington, Delaware 19801

Philip A. Rovner
Potter Anderson & Corroon LLP
1313 N. Market St.
Hercules Plaza, 6th Floor
P.O. Box 951
Wilmington, DE 19899-0951

I hereby certify that on July 5, 2006, I have Electronically Mailed the documents to the following non-registered participants:

Ronald J. Schutz
Diane L. Simerson
Andrea L. Gothing
Nicole N. Morris
Robins, Kaplan, Miller & Ciresi, LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
rjschutz@rkmc.com
dlsimerson@rkmc.com
algothing@rkmc.com
nnmorris@rkmc.com

Douglas R. Weider
Barry J. Schindler
Michael A. Nicodema
Gaston Kroub
Greenberg Traurig LLP
MetLife Building
200 Park Avenue
New York, NY 10166
weiderd@gtlaw.com
nicodemam@gtlaw.com
kroubg@gtlaw.com
schindlerb@gtlaw.com

James G. Gilliland, Jr.
April E. Abele
Robert G. Litts
Townsend and Townsend and Crew LLP
Two Embarcadero Center
San Francisco, CA 94111
jggilliland@townsend.com
aeabele@townsend.com
rglitts@townsend.com

By:     /s/ David E. Moore
        Richard L. Horwitz
        David E. Moore
        Potter Anderson & Corroon LLP
        Hercules Plaza, 6th Floor
        1313 N. Market Street
        Wilmington, DE  19899-0951
        (302) 984-6000
        rhorwitz@potteranderson.com
        dmoore@potteranderson.com

704823