# EXHIBIT 7

A Merriam-Webster®

# Webster's Ninth New Collegiate Dictionary

Almost 160,000 entries and 200,000 definitions.

- Entries for words often misused or confused include a clear, authoritative guide to good usage.
- In an exclusive new feature—entries are dated. How old is a word? When was it first used? The answer is here, but in no other desk dictionary.
- The newest in the famous Collegiate series, the

Case 1:05-cv-00633-SLR    Document 147-3    Filed 07/05/2006    Page 3 of 18



### A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*A Merriam-Webster®* is the registered trademark you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 1988 by Merriam-Webster Inc.

Philippines Copyright 1988 by Merriam-Webster Inc.

Library of Congress Cataloging in Publication Data
Main entry under title:

Webster's ninth new collegiate dictionary.

  Includes index.
  1. English language—Dictionaries.  I. Merriam-
Webster Inc.
PE1628.W5638    1988    423    87-24041
ISBN 0-87779-508-8
ISBN 0-87779-509-6 (indexed)
ISBN 0-87779-510-X (deluxe)

Webster's Ninth New Collegiate Dictionary principal copyright 1983

COLLEGIATE trademark Reg. U.S. Pat. Off.

All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.

Made in the United States of America

30RMcN88

**dif·fu·sion** \dif-'yü-zhən\ n (14c) 1 : the action of diffusing : the state of being diffused 2 : PROLIXITY, DIFFUSENESS 3 a : the process whereby particles of liquids, gases, or solids intermingle as the result of their spontaneous movement caused by thermal agitation and in dissolved substances move from a region of higher to one of lower concentration b (1) : reflection of light by a rough reflecting surface (2) : transmission of light through a translucent material : SCATTERING 4 : the spread of cultural elements from one area or group of people to others by contact 5 : the softening of sharp outlines in a photographic image — **dif·fu·sion·al** \-'yüzh-nəl, -ən-ᵊl\ adj

**dif·fu·sion·ist** \-'yüzh-(ə-)nəst\ n (1924) : an anthropologist who emphasizes the role of diffusion in the history of culture rather than independent invention or discovery — **dif·fu·sion·ism** \-'yü-zhə-,niz-əm\ n

**dif·fu·sive** \dif-'yü-siv, -ziv\ adj (1614) : tending to diffuse : characterized by diffusion (~ motion of atoms) — **dif·fu·sive·ly** adv — **dif·fu·sive·ness** n

**di·func·tion·al** \(ˌ)di-'fəŋ(k)-shnəl, -shən-ᵊl\ adj (1943) : of, relating to, or being a compound with two sites in the molecule that are highly reactive

¹**dig** \'dig\ vb **dug** \'dəg\; **dig·ging** [ME diggen] vt (13c) 1 a : to break up, turn, or loosen (earth) with an implement b : to prepare the soil of (~ a garden) 2 : to bring to the surface by digging : UNEARTH 3 : to hollow out or form by removing earth : EXCAVATE 4 : to drive down so as to penetrate : THRUST 5 : POKE, PROD 6 a : to pay attention to : NOTICE (~ that fancy hat) b : UNDERSTAND, APPRECIATE (if you … do something subtle… only one tenth of the audience will ~ it —Nat Hentoff) c : LIKE, ADMIRE (high school students ~ short poetry —David Burmester) ~ vi 1 : to turn up, loosen, or remove earth : DELVE 2 : to work hard or laboriously 3 : to advance by or as if by removing or pushing aside material

²**dig** n (1819) 1 a : THRUST, POKE b : a cutting remark 2 pl : living accommodations 3 : an archaeological excavation site; also : the excavation itself

**dig·a·my** \'dig-ə-mē\ n, pl **-mies** [LL digamia, fr. LGk, fr. Gk digamos married to two people, fr. di- + -gamos -gamous] (1635) : a second marriage after the termination of the first

**di·gas·tric** \(ˌ)di-'gas-trik\ adj [NL digastricus, fr. di- + gastricus gastric] (ca. 1721) : of, relating to, or being a muscle with two bellies separated by a median tendon

**di·ge·net·ic** \ˌdi-jə-'net-ik\ adj (1883) : of or relating to a subclass (Digenea) of trematode worms in which sexual reproduction as an internal parasite of a vertebrate alternates with asexual reproduction in a mollusk

¹**di·gest** \'di-jest\ n [ME Digest compilation of Roman laws ordered by Justinian, fr. LL Digesta, pl., fr. L, collection of writings arranged under headings, fr. neut. pl. of digestus, pp. of digerere to arrange, distribute, digest, fr. dis- + gerere to carry — more at CAST] (14c) 1 : a summation or condensation of a body of information: as a : a systematic compilation of legal rules, statutes, or decisions b : a periodical devoted to condensed versions of previously published articles 2 : a product of digestion

²**di·gest** \di-'jest, də-\ vb [ME digesten, fr. L digestus] vt (14c) 1 : to distribute or arrange systematically : CLASSIFY 2 : to convert (food) into absorbable form 3 : to take into the mind or memory; esp : to assimilate mentally 4 a : to soften, decompose, or break down by heat and moisture or chemicals b : to extract soluble ingredients from by warming with a liquid 5 : to compress into a short summary ~ vi 1 : to digest food 2 : to become digested

**di·gest·er** \-'jes-tər\ n (15c) 1 : one that digests or makes a digest 2 : a vessel for digesting esp. plant or animal materials

**di·gest·ibil·i·ty** \-ˌjes-tə-'bil-ət-ē\ n, pl **-ties** (1740) 1 : the fitness of something for digestion 2 : the percentage of a foodstuff taken into the digestive tract that is absorbed into the body

**di·gest·ible** \-'jes-tə-bəl\ adj (14c) : capable of being digested

**di·ges·tion** \di-'jes(h)-chən, də-\ n (14c) : the action, process, or power of digesting: as a : the process of making food absorbable by dissolving it and breaking it down into simpler chemical compounds that occurs in the living body chiefly through the action of enzymes secreted into the alimentary canal b : the process in sewage treatment by which organic matter in sludge is decomposed by anaerobic bacteria with the release of a burnable mixture of gases

¹**di·ges·tive** \-'jes-tiv\ n (14c) : something that aids digestion esp. of food

²**digestive** adj (15c) 1 : relating to or functioning in digestion (the ~ system) 2 : having the power to cause or promote digestion (~ enzymes) — **di·ges·tive·ly** adv

**digestive gland** n (1940) : a gland secreting digestive enzymes

**dig·ger** \'dig-ər\ n (15c) 1 a : one that digs b : a tool or machine for digging 2 cap : a No. American Indian (as a Paiute) who digs roots for food 3 : an Australian or New Zealand soldier

**digger wasp** n (1880) : a burrowing wasp; esp : a usu. solitary wasp (superfamily Sphecoidea) that digs nest burrows in the soil and provisions them with insects or spiders paralyzed by stinging

**dig·gings** n pl (1538) 1 : a place of excavating esp. for ore, metals, or precious stones 2 : material dug out 3 a : QUARTERS, PREMISES b chiefly Brit : lodgings for a student

**dight** \'dīt\ vt **dight·ed** or **dight**; **dight·ing** [ME dighten, fr. OE dihtan to arrange, compose, fr. L dictare to dictate, compose] archaic (13c) : DRESS, ADORN

**dig in** vi (1839) 1 : to cover or incorporate by burying (dig in compost) ~ vi 1 : to dig defensive trenches 2 a : to go resolutely to work b : to begin eating 3 : to hold stubbornly to a position 4 : to make small depressions in the ground for better footing while batting (as in baseball)

**dig·it** \'dij-ət\ n [ME, fr. L digitus finger, toe — more at TOE] (14c) 1 a : any of the Arabic numerals 1 to 9 and usu. the symbol 0 b : one of the elements that combine to form numbers in a system other than the decimal system 2 : a unit of length based on the breadth of a finger and equal in English measure to ¾ inch 3 : any of the divisions in which the limbs of amphibians and all higher vertebrates terminate, which are typically five in number but may be reduced (as in the horse), and which typically have a series of phalanges bearing a nail, claw, or hoof at the tip : FINGER, TOE

¹**dig·i·tal** \'dij-ət-ᵊl\ adj [L digitalis] (ca. 1656) 1 : of or relating to fingers or toes : DIGITATE 2 : done with a finger 3 : of or relating to calculation by numerical methods or by discrete units 4 : of or relating to data in the form of numerical digits 5 : providing a readout in numerical digits (a ~ voltmeter) 6 : relating to a phonograph record made from a magnetic tape on which sound waves have been represented digitally so that in the record wow and flutter are eliminated and background noise is reduced — **dig·i·tal·ly** \-'ᵊl-ē\ adv

²**digital** n (1878) : a part (as a key of an organ) that is depressed with a finger to produce a mechanical effect (as the moving of a lever or the closing of a circuit)

**digital computer** n (1947) : a computer that operates with numbers expressed directly as digits — compare ANALOG COMPUTER, HYBRID COMPUTER

**dig·i·tal·in** \ˌdij-ə-'tal-ən also -'tāl-\ n [NL Digitalis] (1837) 1 : a white crystalline steroid glycoside $C_{36}H_{56}O_{14}$ obtained from seeds of the common foxglove 2 : a mixture of the glycosides of digitalis leaves or seeds

**dig·i·tal·is** \-'tal-əs also -'tāl-\ n [NL, genus name, fr. L, of a finger, fr. digitus; fr. its finger-shaped corolla] (1664) 1 : FOXGLOVE 2 : the dried leaf of the common foxglove containing important glycosides and serving as a powerful cardiac stimulant and a diuretic

**dig·i·tal·i·za·tion** \ˌdij-ət-ᵊl-ə-'zā-shən\ n [digitalis] (1882) : the administration of digitalis until the desired physiological adjustment is attained; also : the bodily state so produced

¹**dig·i·tal·ize** \'dij-ət-ᵊl-ˌīz\ vt **-ized; -iz·ing** [digitalis] (1927) : to subject to digitalization

²**dig·i·tal·ize** \'dij-ət-ᵊl-ˌīz\ vt **-ized; -iz·ing** [¹digital] (1962) : DIGITIZE

**dig·i·tate** \'dij-ə-ˌtāt\ adj (1661) 1 : having digits 2 : resembling a finger; specif : having divisions arranged like the fingers of a hand (~ leaves) — **dig·i·tate·ly** adv

**digiti- comb form** [F, fr. L digitus] : digit : finger (digitiform)

**dig·i·ti·grade** \'dij-ət-ə-ˌgrād\ adj [F, fr. digiti- + -grade] (ca. 1833) : walking on the digits with the posterior of the foot more or less raised

**dig·i·tize** \'dij-ə-ˌtīz\ vt **-tized; -tiz·ing** (1953) : to convert (as data or an image) to digital form — **dig·i·ti·za·tion** \ˌdij-ət-ə-'zā-shən\ n — **dig·i·tiz·er** \'dij-ə-ˌtī-zər\ n

**dig·i·to·nin** \ˌdij-ə-'tō-nən\ n [ISV digit- (fr. NL Digitalis) + saponin] (1875) : a steroid saponin $C_{56}H_{92}O_{29}$ occurring in the leaves and seeds of foxglove

**dig·i·tox·i·gen·in** \ˌdij-ə-ˌtäk-sə-'jen-ən\ n [ISV, blend of digitoxin and -gen] (ca. 1909) : a steroid lactone $C_{23}H_{34}O_4$ obtained esp. by hydrolysis of digitoxin

**dig·i·tox·in** \ˌdij-ə-'täk-sən\ n [ISV, blend of NL Digitalis and ISV toxin] (ca. 1883) : a poisonous glycoside $C_{41}H_{64}O_{13}$ that is the most active constituent of digitalis; also : a mixture of digitalis glycosides consisting chiefly of digitoxin

**dig·ni·fied** \'dig-nə-ˌfīd\ adj (1763) : showing or expressing dignity

**dig·ni·fy** \'dig-nə-ˌfī\ vt **-fied; -fy·ing** [MF dignifier, fr. LL dignificare, fr. L dignus worthy — more at DECENT] (15c) 1 : to give distinction to : ENNOBLE 2 : to confer dignity upon by changing name, appearance, or character

**dig·ni·tary** \'dig-nə-ˌter-ē\ n, pl **-tar·ies** (1672) : one who possesses exalted rank or holds a position of dignity or honor — **dignitary** adj

**dig·ni·ty** \'dig-nət-ē\ n, pl **-ties** [ME dignete, fr. OF dignete, fr. L dignitat-, dignitas, fr. dignus] (13c) 1 : the quality or state of being worthy, honored, or esteemed 2 a : high rank, office, or position b : a legal title of nobility or honor 3 archaic : DIGNITARY 4 : formal reserve of manner or language

**dig out** vt (14c) 1 : FIND, UNEARTH 2 : to make hollow by digging

**di·gox·in** \dij-'äk-sən, dig-\ n [ISV dig- (fr. NL Digitalis) + toxin] (ca. 1930) : a poisonous cardiotonic steroid $C_{41}H_{64}O_{14}$ obtained from a foxglove (Digitalis lanata) and used similarly to digitalis

**di·graph** \'dī-ˌgraf\ n (1788) 1 : a group of two successive letters whose phonetic value is a single sound (as ea in bread or ng in sing) or whose value is not the sum of a value borne by each in other occurrences (as ch in chin where the value is \t\ + \sh\) 2 : a group of two successive letters 3 : LIGATURE 4 — **di·graph·ic** \dī-'graf-ik\ adj — **di·graph·i·cal·ly** \-i-k(ə-)lē\ adv

**di·gress** \dī-'gres, də-\ vi [L digressus, pp. of digredi, fr. dis- + gradi to step — more at GRADE] (1530) : to turn aside esp. from the main subject of attention or course of argument in writing or speaking syn see SWERVE

**di·gres·sion** \-'gresh-ən\ n (14c) 1 : the act or an instance of digressing in a discourse or other usu. organized literary work 2 archaic : a going aside — **di·gres·sion·al** \-'gresh-nəl, -ən-ᵊl\ adj — **di·gres·sion·ary** \-'gresh-ə-ˌner-ē\ adj

**di·gres·sive** \-'gres-iv\ adj (1611) : characterized by digressions (a ~ book) — **di·gres·sive·ly** adv — **di·gres·sive·ness** n

**dig up** vt (14c) : FIND, UNEARTH

**dihal-** or **dihalo- comb form** : containing two atoms of a halogen

¹**di·he·dral** \(ˌ)dī-'hē-drəl\ adj (ca. 1909) 1 of airplane wing pairs : inclined at a dihedral angle to each other 2 of an airplane : having wings that make with one another a dihedral angle esp. when the angle between the upper sides is less than 180°

²**dihedral** n (ca. 1909) 1 : DIHEDRAL ANGLE 2 : the angle between an aircraft supporting surface and a horizontal transverse line

**dihedral angle** n [di- + -hedral] (1826) : a figure formed by two intersecting planes

**di·hy·brid** \(ˌ)dī-'hī-brəd\ adj [ISV] (1907) : of, relating to, involving, or being an individual or strain that is heterozygous at two genetic loci — **dihybrid** n

**dihydr-** or **dihydro- comb form** : combined with two atoms of hydrogen

**di·hy·dro·er·got·a·mine** \(ˌ)dī-ˌhī-drō-ˌər-'gät-ə-ˌmēn\ n (1945) : a hydrogenated derivative $C_{33}H_{37}N_5O_5$ of ergotamine that is used in the treatment of migraine

**di·hy·dro·strep·to·my·cin** \-ˌstrep-tə-'mīs-ᵊn\ n (1946) : a drug $C_{21}H_{41}N_7O_{12}$ with antibiotic effects similar to streptomycin but more toxic esp. in its tendency to impair hearing

**dihydroxy- comb form** : containing two hydroxyl groups

**di·hy·droxy·ac·e·tone** \ˌdī-hī-ˌdräk-sē-'as-ə-ˌtōn\ n (1895) : a glyceraldehyde isomer $C_3H_6O_3$ that is used esp. to stain the skin to resemble a tan

**dik–dik** \'dik-ˌdik\ n [native name in East Africa] (1883) : any of several small East African antelopes (genera Madoqua, Rhynchotragus)

**mul·lite** \'məl-ˌīt\ *n* [*Mull*, island of the Inner Hebrides] (1924) : a mineral $Al_6Si_2O_{13}$ or $3Al_2O_3·2SiO_2$ that is an orthorhombic silicate of aluminum resistant to corrosion and heat and used as a refractory

**multi-** *comb form* [ME, fr. MF or L; MF, fr. L, fr. *multus* much, many — more at MELIORATE] **1 a** : many : multiple : much ⟨*multivalent*⟩ **b** : more than two ⟨*multilateral*⟩ **c** : more than one ⟨*multipara*⟩ **2** : many times over ⟨*multimillionaire*⟩

| | | |
|---|---|---|
| mul·ti·age | mul·ti·do·main | mul·ti·or·gas·mic |
| mul·ti·agen·cy | mul·ti·dwell·ing | mul·ti·pa·ram·e·ter |
| mul·ti·ap·er·ture | mul·ti·elec·trode | mul·ti·part |
| mul·ti·ap·proach | mul·ti·elec·tron·ic | mul·ti·par·ti·cle |
| mul·ti·armed | mul·ti·el·e·ment | mul·ti·par·ty |
| mul·ti·at·om | mul·ti·en·gine | mul·ti·path |
| mul·ti·au·thor | mul·ti·eth·nic | mul·ti·pho·ton |
| mul·ti·au·thored | mul·ti·fac·et·ed | mul·ti·pi·on |
| mul·ti·ax·i·al | mul·ti·fac·tion·al | mul·ti·pis·ton |
| mul·ti·band | mul·ti·fam·i·ly | mul·ti·plane |
| mul·ti·bar·rel | mul·ti·fil·a·ment | mul·ti·plant |
| mul·ti·bar·reled | mul·ti·flash | mul·ti·plot |
| mul·ti·bil·lion | mul·ti·flu·id | mul·ti·pole |
| mul·ti·bil·lion·aire | mul·ti·fo·cal | mul·ti·pow·er |
| mul·ti·blad·ed | mul·ti·fre·quen·cy | mul·ti·prob·lem |
| mul·ti·branched | mul·ti·fu·el | mul·ti·prod·uct |
| mul·ti·build·ing | mul·ti·func·tion | mul·ti·pur·pose |
| mul·ti·cam·pus | mul·ti·func·tion·al | mul·ti·ra·cial |
| mul·ti·car | mul·ti·gen·er·a·tion·al | mul·ti·ra·cial·ism |
| mul·ti·car·bon | mul·ti·gen·ic | mul·ti·range |
| mul·ti·caus·al | mul·ti·grade | mul·ti·roomed |
| mul·ti·cell | mul·ti·grid | mul·ti·sea·son |
| mul·ti·celled | mul·ti·group | mul·ti·ser·vice |
| mul·ti·cel·lu·lar | mul·ti·hand·i·capped | mul·ti·sid·ed |
| mul·ti·cel·lu·lar·i·ty | mul·ti·head·ed | mul·ti·site |
| mul·ti·cen·ter | mul·ti·hos·pi·tal | mul·ti·size |
| mul·ti·chain | mul·ti·hued | mul·ti·skilled |
| mul·ti·cham·bered | mul·ti·hull | mul·ti·source |
| mul·ti·chan·nel | mul·ti·in·dus·try | mul·ti·spec·tral |
| mul·ti·char·ac·ter | mul·ti·in·sti·tu·tion·al | mul·ti·speed |
| mul·ti·city | mul·ti·lane | mul·ti·step |
| mul·ti·coat·ed | mul·ti·laned | mul·ti·sto·ried |
| mul·ti·col·or | mul·ti·lev·el | mul·ti·sto·ry |
| mul·ti·col·ored | mul·ti·lev·eled | mul·ti·syl·lab·ic |
| mul·ti·col·umn | mul·ti·lobed | mul·ti·sys·tem |
| mul·ti·com·po·nent | mul·ti·manned | mul·ti·tal·ent·ed |
| mul·ti·con·duc·tor | mul·ti·me·dia | mul·ti·tiered |
| mul·ti·copy | mul·ti·mega·ton | mul·ti·ton |
| mul·ti·coun·ty | mul·ti·mega·watt | mul·ti·tone |
| mul·ti·crest·ed | mul·ti·mem·ber | mul·ti·tow·ered |
| mul·ti·cul·tur·al | mul·ti·me·tal·lic | mul·ti·track |
| mul·ti·cul·tur·al·ism | mul·ti·me·ter | mul·ti·union |
| mul·ti·cu·rie | mul·ti·mil·len·ni·al | mul·ti·unit |
| mul·ti·cur·ren·cy | mul·ti·mil·lion | mul·ti·use |
| mul·ti·de·nom·i·na·tion·al | mul·ti·mil·lion·aire | mul·ti·vi·ta·min |
| mul·ti·di·a·lec·tal | mul·ti·mode | mul·ti·vol·ume |
| mul·ti·di·men·sion·al | mul·ti·mo·lec·u·lar | mul·ti·vol·umed |
| mul·ti·di·men·sion·al·i·ty | mul·ti·mo·tor | mul·ti·wall |
| mul·ti·di·rec·tion·al | mul·ti·na·tion | mul·ti·war·head |
| mul·ti·dis·ci·plin·ary | mul·ti·nu·cle·ar | mul·ti·wave·length |
| mul·ti·dis·ci·pline | mul·ti·nu·cle·ate | mul·ti·year |
| mul·ti·di·vi·sion·al | mul·ti·nu·cle·at·ed | |

**mul·ti·en·zyme** \ˌməl-tē-'en-ˌzīm, -ˌtī-\ *adj* (1961) : composed of or involving two or more enzymes or subunits similar to enzymes esp. when they have related functions in a biosynthetic pathway ⟨~ complex⟩

**mul·ti·fac·to·ri·al** \-fak-'tōr-ē-əl, -'tȯr-\ *adj* (1920) **1** : having characters or a mode of inheritance dependent on a number of genes at different loci **2** *or* **mul·ti·fac·tor** \-'fak-tər\ : having, involving, or produced by a variety of elements or causes ⟨a ~ study⟩ ⟨a disease with a ~ etiology⟩ — **mul·ti·fac·to·ri·al·ly** \-ē-ə-lē\ *adv*

**mul·ti·far·i·ous** \ˌməl-tə-'far-ē-əs, -'fer-\ *adj* [L *multifarius*, fr. *multi-* + *-farius* (akin to *facere* to make, do) — more at DO] (1593) : having or occurring in great variety : DIVERSE — **mul·ti·far·i·ous·ness** *n*

**mul·ti·flo·ra rose** \ˌməl-tə-ˌflōr-ə-, -ˌflȯr-\ *n* [NL *multiflora*, lit., having many flowers] (1829) : a vigorous thorny rose (*Rosa multiflora*) with clusters of small flowers

**mul·ti·fold** \'məl-ti-ˌfōld\ *adj* (1806) : MANY, NUMEROUS

**mul·ti·form** \'məl-ti-ˌfȯrm\ *adj* [F *multiforme*, fr. L *multiformis*, fr. *multi-* + *-formis* -form] (1603) : having many forms or appearances — **mul·ti·for·mi·ty** \ˌməl-ti-'fȯr-mət-ē\ *n*

**mul·ti·germ** \ˌməl-ti-'jərm, -ˌtī-\ *adj* [prob. fr. *multi-* + *germinate*] (1950) : producing or being a fruit cluster capable of giving rise to several plants ⟨a ~ variety of sugar beet⟩

**mul·ti·lat·er·al** \ˌməl-ti-'lat-ə-rəl, -ˌtī-, -'la-trəl\ *adj* (1696) **1** : having many sides **2** : involving or participated in by more than two nations or parties ⟨~ agreements⟩ — **mul·ti·lat·er·al·ly** \-ē\ *adv*

**mul·ti·lay·ered** \-'lā-ərd, -'le(-ə)rd\ *or* **mul·ti·lay·er** \-'lā-ər, -'le(-ə)r\ *adj* (1931) : having or involving several distinct layers, strata, or levels ⟨~ epidermis⟩ ⟨~ tropical rain forest⟩ ⟨~ personality⟩

**mul·ti·lin·gual** \-'liŋ-g(yə-)wəl\ *adj* (1838) **1** : of, containing, or expressed in several languages ⟨a ~ sign⟩ ⟨~ dictionaries⟩ **2** : using or able to use several languages ⟨~ translators⟩ — **mul·ti·lin·gual·ism** \-g(yə-)wə-ˌliz-əm\ *n* — **mul·ti·lin·gual·ly** \-g(yə-)wə-lē\ *adv*

**mul·ti·mod·al** \-'mōd-ᵊl\ *adj* (1902) : having or involving several modes, modalities, or maxima ⟨~ distributions⟩ ⟨~ responses⟩

**mul·ti·na·tion·al** \-'nash-nəl, -ən-ᵊl\ *adj* (1926) **1** : of or relating to more than two nationalities ⟨a ~ society⟩ **2 a** : of, relating to, or involving more than two nations ⟨a ~ alliance⟩ **b** : having divisions in more than two countries ⟨a ~ corporation⟩ — **multinational** *n*

**mul·ti·no·mi·al** \-'nō-mē-əl\ *n* [*multi-* + *-nomial* (as in *binomial*)] (1674) : a mathematical expression that consists of the sum of several terms : POLYNOMIAL — **multinomial** *adj*

**mul·tip·a·rous** \ˌməl-'tip-ə-rəs\ *adj* [NL *multiparus*, fr. *multi-* + L *-parus* *-parous*] (1646) **1** : producing many or more than one at a birth **2** : having experienced one or more previous parturitions

**mul·ti·par·tite** \ˌməl-ti-'pär-ˌtīt\ *adj* [L *multipartitus*, fr. *multi-* + *partitus*, pp. of *partire* to divide, fr. *part-, pars* part] (ca. 1721) **1** : divided into several or many parts **2** : having numerous members or signatories ⟨a ~ treaty⟩

**mul·ti·phase** \'məl-ti-ˌfāz\ *adj* (ca. 1890) : having various phases; *esp* : POLYPHASE

**mul·ti·pha·sic** \ˌməl-ti-'fā-zik, -ˌtī-\ *adj* (1940) : having various phases or elements ⟨a ~ test⟩

**¹mul·ti·ple** \'məl-tə-pəl\ *adj* [F, fr. L *multiplex*, fr. *multi-* + *-plex* -fold — more at -FOLD] (1647) **1** : consisting of, including, or involving more than one ⟨~ births⟩ **2** : MANY, MANIFOLD ⟨~ achievements⟩ **3** : shared by many ⟨~ ownership⟩ **4** : having numerous aspects or functions : VARIOUS **5 a** : being a circuit with a number of conductors in parallel **b** : being a group of terminals which make a circuit available at a number of points **6** : formed by coalescence of the ripening ovaries of several flowers ⟨a ~ fruit⟩

**²multiple** *n* (1685) **1 a** : the product of a quantity by an integer ⟨35 is a ~ of 7⟩ **b** : something in units of more than one or two **2** : PARALLEL 4b

**multiple allele** *n* (1938) : any of more than two allelic factors located at one chromosomal locus

**multiple-choice** *adj* (1927) **1** : having several answers from which one is to be chosen ⟨a ~ question⟩ **2** : composed of multiple-choice questions ⟨a ~ test⟩

**multiple factor** *n* (1915) : one of a group of nonallelic genes that according to the multiple-factor hypothesis control various quantitative hereditary characters

**multiple myeloma** *n* (1897) : a disease of bone marrow that is characterized by the presence of numerous myelomas in various bones of the body

**multiple personality** *n* (1901) : an hysterical neurosis in which the personality becomes dissociated into two or more distinct but complex and socially and behaviorally integrated parts each of which becomes dominant and controls behavior from time to time to the exclusion of the others — compare SPLIT PERSONALITY

**multiple regression** *n* (1924) : regression in which one variable is estimated by the use of more than one other variable

**multiple sclerosis** *n* (1885) : a diseased condition marked by patches of hardened tissue in the brain or the spinal cord and associated esp. with partial or complete paralysis and jerking muscle tremor

**multiple star** *n* (1850) : several stars in close proximity that appear to form a single system

**multiple store** *n*, *chiefly Brit* (1929) : CHAIN STORE

**mul·ti·plet** \'məl-tə-ˌplət\ *n* (1922) **1** : a spectrum line having several components **2** : a group of elementary particles that are different in charge but similar in other properties (as mass)

**mul·ti·ple-val·ued** \ˌməl-tə-pəl-'val-(ˌ)yüd\ *adj* (1882) : having at least one and sometimes more of the values of the range associated with each value of the domain ⟨a ~ function⟩ — compare SINGLE-VALUED

**multiple voting** *n* (ca. 1902) : illegal voting by one person in two or more constituencies

**¹mul·ti·plex** \'məl-tə-ˌpleks\ *adj* [L] (1557) **1** : MANY, MULTIPLE **2** : being or relating to a system of transmitting several messages simultaneously on the same circuit or channel

**²multiplex** *vt* (1907) : to send (messages or signals) by a multiplex system ~ *vi* : to multiplex messages or signals — **mul·ti·plex·er** *or* **mul·ti·plex·or** \-ər\ *n*

**mul·ti·pli·cand** \ˌməl-tə-pli-'kand\ *n* [L *multiplicandus*, gerundive of *multiplicare*] (1594) : the number that is to be multiplied by another

**mul·ti·pli·ca·tion** \ˌməl-tə-plə-'kā-shən\ *n* [ME *multiplicacioun*, fr. MF *multiplication*, fr. L *multiplication-, multiplicatio*, fr. *multiplicatus*, pp. of *multiplicare* to multiply] (14c) **1** : the act or process of multiplying : the state of being multiplied **2 a** : a mathematical operation that at its simplest is an abbreviated process of adding an integer to itself a specified number of times and that is extended to other numbers in accordance with laws that are valid for integers **b** : any of various mathematical operations that are analogous in some way to multiplication of the real numbers but are defined for other or larger sets of elements (as complex numbers, vectors, matrices, or functions)

**multiplication sign** *n* (1907) : a symbol used to indicate multiplication: **a** : TIMES SIGN **b** : DOT 2b

**mul·ti·pli·ca·tive** \ˌməl-tə-'plik-ət-iv, 'məl-tə-plə-ˌkāt-\ *adj* (1653) **1** : tending or having the power to multiply **2** : of, relating to, or associated with a mathematical operation of multiplication ⟨the ~ property of 0 requires that $a·0 = 0$ and $0·a = 0$⟩ — **mul·ti·pli·ca·tive·ly** *adv*

**multiplicative identity** *n* (1958) : an identity element (as 1 in the group of rational numbers without 0) that in a given mathematical system leaves unchanged any element by which it is multiplied

**multiplicative inverse** *n* (1958) : an element of a mathematical set that when multiplied by a given element yields the identity element — called also *reciprocal*

**mul·ti·plic·i·ty** \ˌməl-tə-'plis-ət-ē\ *n*, *pl* **-ties** [ME, fr. MF *multiplicité*, fr. LL *multiplicitat-, multiplicitas*, fr. L *multiplic-, multiplex*] (15c) **1** : the quality or state of being multiple or various **2** : a great number **3** : the number of times a root of an equation or zero of a function occurs when there is more than one root or zero ⟨the ~ of $x = 2$ for the equation $(x − 2)^3 = 0$ is 3⟩ **4** : the number of components in a system (as a multiplet or a group of energy levels)

**mul·ti·pli·er** \'məl-tə-ˌplī(-ə)r\ *n* (15c) : one that multiplies: as **a** : a number by which another number is multiplied **b** : an instrument or device for multiplying or intensifying some effect **c** : a key-operated machine or mechanism or circuit on a machine that multiplies figures and records the products

**¹mul·ti·ply** \'məl-tə-ˌplī\ *vb* **-plied; -ply·ing** [ME *multiplien*, fr. OF *multiplier*, fr. L *multiplicare*, fr. *multiplic-, multiplex* multiple] *vt* (13c) **1** : to increase in number esp. greatly or in multiples : AUGMENT **2 a** : to find the product of by multiplication ⟨~ 7 and 8⟩ **b** : to use as a

---

\ə\ abut  \ᵊ\ kitten, F table  \ər\ further  \a\ ash  \ā\ ace  \ä\ cot, cart
\au̇\ out  \ch\ chin  \e\ bet  \ē\ easy  \g\ go  \i\ hit  \ī\ ice  \j\ job
\ŋ\ sing  \ō\ go  \o̊\ law  \o̊i\ boy  \th\ thin  \t͟h\ the  \ü\ loot  \u̇\ foot
\y\ yet  \zh\ vision  \ə, k, ⁿ, œ, œ̄, ᵫ, ᴁ, ʳ\ see Guide to Pronunciation

# EXHIBIT 8



BARRON'S
BUSINESS
GUIDES

# Dictionary of Computer and Internet Terms

Fifth Edition



- More than 1,800 key computer terms with definitions
- Includes hundreds of words and expressions that apply specifically to the Internet
- User-friendly descriptions of programming concepts, desktop and other applications, and much more
- Filled with illustrations

Douglas Downing, Ph.D., Michael Covington, Ph.D., and Melody Mauldin Covington

© Copyright 1996 by Barron's Educational Series, Inc.
Prior editions © copyright 1995, 1992, 1989, and 1986
by Barron's Educational Series, Inc.

All rights reserved.
No part of this book may be reproduced in any form, by photostat, microfilm, xerography, or any other means, or incorporated into any information retrieval system, electronic or mechanical, without the written permission of the copyright owner.

*All inquiries should be addressed to:*
Barron's Educational Series, Inc.
250 Wireless Boulevard
Hauppauge, New York 11788

*Library of Congress Catalog Card No. 96-9250*

International Standard Book No. 0-8120-9811-0

**Library of Congress Cataloging-in-Publication Data**

Downing, Douglas.
  Dictionary of computer terms / Douglas A. Downing, Michael Covington, Melody Mauldin Covington—5th ed.
      p.     cm.
  Previous eds. published under title: Dictionary of computer terms.
  ISBN 0-8120-9811-0
  1. Computers—Dictionaries.     2. Internet (Computer network)—Dictionaries.     I. Covington, Michael A., 1957–     . II. Covington, Melody Mauldin.    III. Downing, Douglas. Dictionary of computer terms.   IV. Title.
    QA76.15.D667       1996
    004'.03—dc20                                    96-9250
                                                      CIP

PRINTED IN THE UNITED STATES OF AMERICA

9 8 7 6 5 4 3 2

**UPLOAD**  392

| | |
|---|---|
| cc | Compile a C Program. (*See* C.) |
| cp | Copy a file onto a file or into a directory. |
| diff | Display the differences between two text files. |
| grep | Search a file for lines matching a pattern. |
| ls | List contents of a directory. |
| mkdir | Create a directory. |
| lpr | Print a file. |
| rm | Remove (delete) a file. |
| rmdir | Delete a directory (which must be empty). |

**UPLOAD** to transmit a file to a central computer from a smaller computer or a computer at a remote location. *See* KERMIT; XMODEM; FTP. *Contrast* DOWNLOAD.

**UPPERCASE** capital letters, such as A, B, C, as opposed to a, b, c (lowercase) or A, B, C (small caps).

**UPS** *see* UNINTERRUPTIBLE POWER SUPPLY.

**UPWARD COMPATIBILITY** the situation in which a computer program or accessory works not only on the machine for which it was designed but also on newer models. For instance, programs written for the IBM PC in 1981 will still run (considerably faster) on present-day Pentium machines. Thus we say that the Pentium is upward compatible with the processor in the PC. *Contrast* DOWNWARD COMPATIBILITY.

**URL** (Uniform Resource Locator or Universal Resource Locator) a way of specifying the location of publicly available information on the Internet, in the form

*protocol://machine:port number/filename*

Often the port number and/or the filename is unnecessary. For example,

`http://ai.uga.edu:80/`

means 'connect to port 80 of `ai.uga.edu` using Hypertext Transfer Protocol,' and

`ftp://ai.uga.edu/pub/natural.language/Contents`

means to download a particular file from `ai.uga.edu` by File Transfer Protocol. Other possible protocols include `gopher` and `telnet`. *See* WORLD WIDE WEB; INTERNET; HTTP; BROWSER; GOPHER; TELNET.

**USENET**
1. a set of thousands of newsgroups (discussion forums) distributed via the Internet (formerly distributed through the Usenet wide-area network). Newsgroups have names such as `sci.astro.amateur` and are arranged into hierarchies (classifications), of which the main ones are:

# EXHIBIT 9



--- F.3d ----  
--- F.3d ----, 2006 WL 1703376 (C.A.Fed. (Mich.))  
(Cite as: --- F.3d ----)

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States Court of Appeals,Federal Circuit.
HONEYWELL INTERNATIONAL, INC. and
HONEYWELL INTELLECTUAL PROPERTIES,
INC., Plaintiffs-Appellants,
v.
ITT INDUSTRIES, INC. and ITT AUTOMOTIVE,
INC., Defendants-Appellees,
andTG North America Corporation, TG Fluid
Systems USA Corporation, and A. Raymond, Inc.,
Defendants-Appellees.
No. 05-1407.

June 22, 2006.

**Background:** The United States District Court for the Eastern District of Michigan, Avern Cohn, Senior Judge, granted summary judgment of noninfringement of a patent for an electrostatically dissipative fuel system component, and patentee appealed.

**Holdings:** The Court of Appeals, Lourie, Circuit Judge, held that:

1(1) patent claim term "fuel injection system component" was limited to a fuel filter;

3(2) patentee disavowed carbon fibers from the scope of the patent's claims; and

4(3) accused quick connects, which did not perform the fuel filtering function, did not infringe patent under the doctrine of equivalents.

Affirmed.

[1] Patents 291 ⟶101(4)

291 Patents
    291IV Applications and Proceedings Thereon
        291k101 Claims
            291k101(4) k. Specifications and Drawings, Construction With. Most Cited Cases
Patent claim term "fuel injection system component" was limited to a fuel filter; on at least four occasions, the written description referred to the fuel filter as "this invention" or "the present invention," and written description did not indicate that a fuel filter was merely a preferred embodiment of the claimed invention.

[2] Patents 291 ⟶168(2.1)

291 Patents
    291IX Construction and Operation of Letters Patent
        291IX(B) Limitation of Claims
            291k168 Proceedings in Patent Office in General
                291k168(2) Rejection and Amendment of Claims
                    291k168(2.1) k. In General. Most Cited Cases
Where the written description clearly identifies what his invention is, an expression by a patentee during prosecution that he intends his claims to cover more than what his specification discloses is entitled to little weight.

[3] Patents 291 ⟶167(1.1)

291 Patents
    291IX Construction and Operation of Letters Patent
        291IX(B) Limitation of Claims
            291k167 Specifications, Drawings, and Models
                291k167(1.1) k. Specification as Limiting or Enlarging Claims. Most Cited Cases
Patent claim term "electrically conductive fibers," as used in patent for electrostatically dissipative fuel system component, did not encompass carbon fibers; patentee disavowed carbon fibers from the scope of the patent's claims where disclosure in the written description demeaned the properties of carbon fibers.

[4] Patents 291 ⟶237

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k233 Patents for Machines or Manufactures
                291k237 k. Substitution of Equivalents. Most Cited Cases
Accused quick connects, which did not perform the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fuel filtering function, did not infringe patent for electrostatically dissipative fuel system component under the doctrine of equivalents; accused quick connects did not meet, literally or equivalently, the "fuel injection system component" or "electrically conductive fibers" claim limitations.

**Patents 291** ⚎328(2)

291 Patents
    291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
        291k328 Patents Enumerated
            291k328(2) k. Original Utility. Most Cited Cases

**Patents 291** ⚎328(2)

291 Patents
    291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
        291k328 Patents Enumerated
            291k328(2) k. Original Utility. Most Cited Cases
5,076,920, 5,076,920. Cited.

5,164,879. Not Infringed.

Appealed from: United States District Court for the Eastern District of Michigan. Senior Judge Avern Cohn.

Dan L. Bagatell, Perkins Coie Brown & Bain P.A., of Phoenix, Arizona, argued for plaintiffs-appellants. Of counsel on the brief were R. Terrance Rader and Glenn E. Forbis, Rader, Fishman & Grauer PLLC, of Bloomfield Hills, Michigan. Of counsel was Kristin L. Murphy, Rader, Fishman & Grauer PLLC.
Thomas N. Young, Young & Basile, P.C., of Troy, Michigan, argued for defendants-appellees, ITT Industries, Inc., et al.
Stephen L. Sulzer, Connolly Bove Lodge & Hutz LLP, of Washington, DC, argued for defendants-appellees, TG North America Corporation, et al. With him on the brief was James P. Calve.

Before MAYER, LOURIE, and DYK, Circuit Judges.
LOURIE, Circuit Judge.
*1 Honeywell International, Inc. and Honeywell Intellectual Properties, Inc. (collectively "Honeywell") appeal from the final decision of the United States District Court for the Eastern District of Michigan granting summary judgment of noninfringement of U.S. Patent 5,164,879 in favor of ITT Industrials, Inc., ITT Automotive, Inc., TG North America Corporation, TG Fluid Systems USA Corporation, and A. Raymond, Inc. (collectively "ITT/TG"). Honeywell Int'l, Inc. v. ITT Indus., Inc., Civ. No. 02-73948 (E.D. Mich. April 27, 2005). Because the district court correctly construed the claim limitation "fuel system component" and determined that the accused products do not meet that limitation, we affirm its grant of summary judgment of noninfringement. We further conclude that under our modified construction of the claim limitation "electrically conductive fibers," the accused products do not meet that limitation either, thereby providing a separate ground for affirming the district court's grant of summary judgment of noninfringement.

BACKGROUND

The '879 patent, entitled "Electrostatically Dissipative Fuel System Component," discloses a fuel filter that is specially made for use in motor vehicles that have electronic fuel injection ("EFI") systems. Before motor vehicles began using EFI systems, the housing of a fuel filter was commonly made of metal or a polymer material. '879 Patent, col.1 ll.10-12 (filed July 1, 1991). Once vehicles began using EFI systems, as the '879 patent's written description recognizes, fuel filters with polymer housing began to break down and start leaking. Id., col.1 ll.17-20. It was discovered that the breakdowns were caused by the contact between the fuel, which flows at a high velocity in EFI systems, and the fuel filter's polymer housing. The resultant friction strips electrons from the hydrocarbon fuel and traps them in the non-conductive polymer housing, which leads to an electrostatic charge buildup within the housing of the fuel filter. Id., col.1 ll.26-30. The charge continues to build up until it finally discharges by "arcing" onto the vehicle's metal frame and becomes grounded. "Arcing" forms microscopic holes in the fuel filter's housing. Id., col.2 l.59 to col.3 l.2. When enough microscopic holes are formed, the fuel begins to leak. Fuel filters with metal housing avoid the "arcing" phenomenon because they allow no charge buildup. The conductive nature of metal prevents the electrons from being trapped inside the fuel filter and allows them to pass through to the vehicle's frame. Fuel filters with housing made of polymer material, however, are more desirable than their metal housing counterparts because of their lower cost and weight. Id., col.1 ll.13-14.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The patented invention addresses the "arcing" problem in fuel filters with polymer housing by providing an electrically conductive pathway between the fuel filter and the vehicle's metal frame. *Id.,* col.3 ll.41-43. The electrically conductive pathway prevents the electrostatic charge from building up within the housing of the fuel filter. *Id.,* col.3 ll.3-6. According to the written description, the electrically conductive pathway is created by incorporating small amounts of a "conductive filler material" into the polymer housing. *Id.,* col.3 ll.47-51. The written description further discloses that stainless steel is an ideal "conductive filler material" because it has high conductivity, allowing it to be used in fibers with a high aspect ratio. *Id.,* col.3 l.53 to col.4 l.13. The written description also notes that stainless steel fibers are ductile, which allows them to better maintain their integrity during melt-processing. *Id.* The benefits of stainless steel fibers are contrasted in the written description to electrically conductive carbon fibers, which are said to have less desirable characteristics, *e.g.,* they must be used in fibers with smaller aspect ratios, are more rigid, and act as stress concentrators. *Id.,* col.3 ll.56-60; col.4 ll.1-5.

*2 Turning to the prosecution history of the patent in suit, the '879 patent issued from a divisional application of U.S. Patent Application 575,260, which issued as U.S. Patent 5,076,920 and was entitled "Electrostatically Dissipative Fuel Filter." Also issuing from a divisional application of the '260 application was U.S. Patent 5,164,084, also entitled "Electrostatically Dissipative Fuel Filter." The drawing and written description sections for the '879, '920, and '084 patents appear to be identical. *See Honeywell Int'l, Inc. v. ITT Indus., Inc.,* 330 F.Supp.2d 865, 871 (E.D.Mich.2004). The patent examiner for the '260 application issued a restriction requirement in that application because it claimed three distinct inventions: (1) a method for preventing breakdown of a fuel filter, (2) the fuel filter itself, and (3) a moldable polymeric material. *Id.* Faced with this restriction requirement, the patentee chose the first invention for immediate prosecution, a method for preventing breakdown of a fuel filter, and that became the claimed subject matter of what issued as the '920 patent. The patentee filed divisional applications for the remaining inventions resulting in two other patents, the '084 patent (for a fuel filter) and the '879 patent (for a moldable polymeric material), the patent at issue in this case.

The '879 application, as initially filed, was entitled "Electrostatically Dissipative Fuel Filter" and contained one independent claim directed to a "moldable material for fuel system components." [FN1] The patent examiner rejected the claim on the ground of, *inter alia,* indefiniteness under 35 U.S.C. § 112, ¶ 2. According to the examiner, it was "not clear what fuel system components [were] intended to be constructed of the electrically conductive moldable material." In addressing the indefiniteness rejection, the patentee deleted the "moldable material for" language so that the claims were directed to a "fuel system component." The patentee also argued that the independent claim was not indefinite because, although the specification only referred to fuel filters and fuel lines, "it is Applicant's position that he is entitled to a claim broad enough to cover *all* fuel system components manufactured of the moldable material disclosed and claimed in the specification." While the application was pending, the title of the '879 application was changed to "Electrostatically Dissipative Fuel System Component," because, the patentee contended, it "more accurately reflect[ed] the scope of the claims." After an interview between the patentee and examiner, which resulted in the "arcing" limitation being added, the claims were allowed and the patent issued. Following a reexamination proceeding, the sole independent claim was further amended to recite "fuel injection system component" instead of "fuel system component" as the subject matter of the claims.

On October 2, 2002, Honeywell filed suit against ITT/TG for infringement of the '879 patent. Claim 1 of the '879 patent, the patent's only independent claim, provides as follows:

*3 Fuel injection system component for communicating fuel to the engine of a motor vehicle, said motor vehicle having an electrical plane maintained at a predetermined electrical potential, said fuel system component being made of a composite material comprising a polymer having electrically conductive fibers distributed randomly throughout the material to provide an electrically conductive path through said component between the fuel communicated through said component and said electrical plane, so that at least a portion of the electrically conductive path extends through the component to thereby prevent build-up of electrostatic charge in the fuel and the resultant arcing which causes the breakdown of the polymer material comprising the fuel injection system component.

The products accused of infringement are "quick connects" manufactured and sold by ITT/TG. Quick connects are nut-like structures that join the various components of a fuel injection system together, such

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

as a fuel line to a fuel filter. The accused quick connects have polymer housing that is interlaced with carbon fiber. ITT/TG denied the charge of infringement, and the district court subsequently held a *Markman* hearing to construe various limitations of the '879 patent, including "fuel injection system component" and "electrically conductive fiber."

The district court construed the "fuel injection system component" limitation to mean "a fuel filter." In arriving at its construction, the court recognized that the ordinary meaning of the term "refers to any constituent part of the fuel injection system of a motor vehicle including, for example, fuel filters, fuel lines, and connectors." *Honeywell*, 330 F.Supp.2d at 878. The court also recognized that the patentee made statements during the prosecution of the '879 and '084 applications that could be interpreted to mean that the scope of the "fuel injection system component" limitation was broader than only fuel filters, at least in the patentee's view.

Notwithstanding the ordinary meaning or the prosecution history, the court determined that the written description clearly limited the "fuel injection system component" to a fuel filter, and that the statements in the prosecution history could not be used to enlarge the content of the written description. *Id.* at 882-83. According to the court, on several occasions in the written description, the "invention" was identified to be only a fuel filter. *Id.* at 879. Moreover, the court explained, "[t]he entire specification of the '879 patent, as well as the sole drawing, describe the elements and operation of a fuel filter with electrically conductive fibers. No other parts are described." *Id.* Given the written description, the court concluded that "the patentee characterized a fuel filter as the only embodiment of his invention, not merely a 'preferred' version of all possible embodiments." *Id.* at 880.

The district court also construed the claim term "electrically conductive fibers" to mean "fibers of a material that conducts electricity, including, without limitation, metal and carbon." *Id.* at 888. According to the court, that was the ordinary meaning of "electrically conductive fibers." The court gave the term its ordinary meaning despite a detailed disclosure in the written description why metal fibers were preferable to carbon fibers. *Id.* at 884. In the court's view, the disclosure was "not like the clear specification language defining the 'invention' as a fuel filter." *Id.* The court determined that the disclosure distinguishing metal and non-metal conductive fibers merely reflected the patentee's preferred embodiment. *Id.* at 884-85. The court further noted that the written description never stated that carbon fibers could not be used as electrically conductive fibers. *Id.*

*4 After the court issued its claim construction, ITT/TG filed a motion for summary judgment of noninfringement, which the court granted. In concluding that the accused products did not infringe the '879 patent, the court determined that quick connects are not fuel filters, and thus they do not literally infringe. *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, Civ. No. 02-73948, slip op. at 9 (E.D.Mich. May 17, 2005). Moreover, the court found that quick connects do not infringe under the doctrine of equivalents because they are not interchangeable with a fuel filter, and they do not compete commercially with fuel filters. *Id.* The also court determined that Honeywell could not invoke the doctrine of equivalents to encompass the accused quick connects in view of the written description's identification of a fuel filter as "the present invention." According to the court, the patentee knew of fuel system components other than fuel filters, and that because he limited the claims to a fuel filter, all other fuel system components were dedicated to the public, and thus outside the reach of the doctrine of equivalents. *Id.*, slip op. at 13-14.

The district court entered final judgment on April 27, 2005. Honeywell timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

DISCUSSION

We review a district court's grant of summary judgment *de novo*, reapplying the same standard used by the district court. *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed.Cir.1998); *Stratienko v. Cordis Corp.*, 429 F.3d 592, 597 (6th Cir.2005). Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Claim construction is an issue of law, *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed.Cir.1995) (en banc), that we also review *de novo*, *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed.Cir.1998) (en banc).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----  
--- F.3d ----, 2006 WL 1703376 (C.A.Fed. (Mich.))  
(Cite as: --- F.3d ----)

Page 5

I.

On appeal, Honeywell argues that the district court erred by limiting the "fuel injection system component" limitation to a fuel filter and including no other component of a fuel injection system. In doing so, Honeywell contends that the court imported a limitation from the specification into the claims and thereby improperly limited the scope of the claims to the specification's preferred embodiment. According to Honeywell, nothing in the specification explicitly limits the claim term to a "fuel filter." Honeywell relies on a statement contained in the specification referring to "the metallic components used in prior art systems," '879 Patent, col.1 ll.32-33, to argue that the term "component" was meant to be broad. It also cites the patent's abstract, which summarized the invention using the term "component," and the title of the patent as amended, to further argue that the specification did not limit the "fuel injection system component" to a fuel filter.

*5 In addition, Honeywell points to the prosecution history in assigning error to the district court's construction of the "fuel injection system component" limitation. According to Honeywell, the patentee stated during prosecution that the intended scope of the claims was to include "*all* fuel components manufactured of the moldable material disclosed and claimed in the specification." Honeywell also notes that the patent examiner issued a restriction requirement during prosecution of the '084 application (which also included claims to "fuel filters") because "the fuel system component [claims] do[ ] not specifically require that the component be a fuel filter."

Mainly reiterating the points made by the district court in its claim construction decision, ITT/TG responds that the claim term "fuel injection system component" was correctly limited to a fuel filter. ITT/TG also argues, however, that the court erred in its construction of the "electrically conductive fibers" limitation. ITT/TG contends that the court should have construed that term to include only metal fibers with a high aspect ratio, not carbon fibers. According to ITT/TG, the written description compared the properties of metal and carbon fibers, and "disparaged" the use of the latter as an electrically conductive fiber. ITT/TG contends that there was a clear disavowal of carbon fibers from the scope of the claims. Moreover, because the accused quick connects are indisputably made with carbon fibers, ITT/TG asserts that there can be no infringement either literally or under the doctrine of equivalents.

[1] We agree with the district court that the claim term "fuel injection system component" is limited to a fuel filter. In *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed.Cir.2005) (en banc), this court recognized that "claims 'must be read in view of the specification, of which they are a part.' " We further stated that "the specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.' " *Id.* (internal citations omitted). Here, the written description uses language that leads us to the conclusion that a fuel filter is the only "fuel injection system component" that the claims cover, and that a fuel filter was not merely discussed as a preferred embodiment. On at least four occasions, the written description refers to the fuel filter as "this invention" or "the present invention":

This invention relates to a fuel filter for use in the fuel line that delivers fuel to a motor vehicle engine. '879 Patent, col.1 ll.8-9.

According to the present invention, a fuel filter for a motor vehicle is made from a moldable material which may be safely used in vehicles equipped with electronic fuel injection system. *Id.*, col.1 ll.40-43.

This and other advantages of the present invention will become apparent from the following descriptions, with reference to the accompanying drawing, the sole Figure of which is a cross-sectional view of a fuel filter made pursuant to the teachings of the present invention.... *Id.*, col.1 ll.43-49.

*6 According to the present invention, an electrically conductive path is provided between the fuel within the inlet cavity 42 [of the fuel filter] and the [vehicle] body 38. *Id.*, col.3 ll.41-43.

The public is entitled to take the patentee at his word and the word was that the invention is a fuel filter.

Moreover, the written description does not indicate that a fuel filter is merely a preferred embodiment of the claimed invention. The fuel filter was the only component of an EFI system that the written description disclosed as having a polymer housing with electrically conductive fibers interlaced therein. The only other fuel component specifically mentioned in the written description, the fuel line, was not required by the patentee to be made of an electrically conductive polymer material, as the claims require. *See id.*, col.1 ll.59-60 (stating that the "fuel line may also be made of a non-conductive material"). The written description's detailed discussion of the prior art problem addressed by the patented invention, *viz.*, leakage of non-metal fuel

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

filters in EFI systems, further supports the conclusion that the fuel filter is not a preferred embodiment, but an only embodiment. *Id.*, col.1 ll.10-25. Given the written description's disclosure, we conclude that the patentee has limited the scope of the '879 patent claims to a fuel filter.

Nor are we persuaded by Honeywell's argument that the patentee confirmed a broader scope of his claims during prosecution. Honeywell relies mainly on the patentee's response to the examiner's indefiniteness rejection in which he stated that the claims cover "*all* fuel components manufactured of the moldable material disclosed and claimed in the specification." Honeywell places too much weight on that statement, as we find it to be ambiguous and possibly inconsistent with the written description. After all, the only fuel component disclosed and claimed in the patent was a fuel filter. In any event, such a broad and vague statement cannot contradict the clear statements in the specification describing the invention more narrowly.

We also do not assign much weight to the patent examiner's restriction requirement with respect to claims for a "fuel filter" and a "fuel system component" during prosecution of the '084 application. In making the restriction requirement, the examiner did not construe the claim term "fuel system component" or determine its meaning in light of the written description. He merely required that the applicant elect one aspect of his invention for prosecution without applying it to the specification.

[2] Nevertheless, even if we were to agree with Honeywell that the patentee clearly expressed his intention during prosecution to have the "fuel injection system component" limitation include components in addition to a fuel filter, it would not change the result in this case. As we determined above, the written description provides only a fuel filter that is made with polymer housing and electrically conductive fibers interlaced therein. No other fuel injection system component with the claimed limitations is disclosed or suggested. Where, as here, the written description clearly identifies what his invention is, an expression by a patentee during prosecution that he intends his claims to cover more than what his specification discloses is entitled to little weight. *See Biogen, Inc. v. Berlex Labs.,* 318 F.3d 1132, 1140 (Fed.Cir.2003) (stating that "[r]epresentations during prosecution cannot enlarge the content of the specification").

*7 [3] We disagree, however, with the district court's construction of the claim term "electrically conductive fibers" to the extent that it encompasses carbon fibers. This court has recognized that "[w]here the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *Scimed Life Sys. v. Advanced Cardiovascular Sys.,* 242 F.3d 1337, 1341 (Fed.Cir.2001). It is true, as the district court noted, that the '879 patent's written description did not expressly define "electrically conductive fibers," as it did for "fuel injection system component." Nevertheless, based on the disclosure in the written description, which demeaned the properties of carbon fibers, we conclude that the patentee thereby disavowed carbon fibers from the scope of the '879 patent's claims.

The written description contains the following disclosure:
Stainless steel also has the advantage of requiring smaller quantities for providing the required conductivity than other conductive fillers, *such as carbon black.* '879 Patent, col.3 ll.56-60 (emphasis added).
Other electrically conductive fillers, *such as the aforementioned carbon,* act as stress concentrators and, at the relatively high filler loadings required to achieve conductivity, restrict the ability of the resin matrix to yield under stress. *Id.*, col.4 ll.1-5 (emphasis added).
Also, stainless steel fibers are ductile and non-rigid *unlike straight or metallized carbon fibers....* This allows stainless steel fibers to maintain their integrity better during melt-processing. *Id.,* col.4 ll.5-10 (emphasis added).
*Unlike the non-metallic fibers,* stainless steel fibers also do not increase mechanical strength or stiffness of the base resin significantly. Other metal fibers with high aspect ratios can be satisfactorily substituted for stainless steel. *Id.,* col.4 ll.10-14 (emphasis added).

In making the above statements, the patentee informed its readers specifically why carbon fibers would not be suitable as "electrically conductive fibers" in the claimed invention. If the written description could talk, it would say, "Do not use carbon fibers." There is no other way to interpret the written description's listing of all the reasons that metal fibers fare better than carbon fibers for use in the claimed invention, even though both materials are electrically conductive, *viz.,* that metal fibers require

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

smaller quantities to achieve the desired conductivity than carbon fibers, create less stress concentration, are more ductile, are less rigid, and increase the mechanical strength of the polymer housing. Contrary to the district court's understanding, the written description has gone beyond expressing the patentee's preference for one material over another. Its repeated derogatory statements concerning one type of material are the equivalent of disavowal of that subject matter from the scope of the patent's claims.

*8 In reaching this decision, we reject Honeywell's argument in support of the district court's construction of "electrically conductive fibers." Honeywell argues that the written description did identify carbon fibers as electrically conductive fibers, and that stainless steel fibers were merely preferred embodiments. Honeywell's argument misses the point. It is precisely because the written description has identified carbon fibers as electrically conductive, and yet it denigrated carbon fibers' applicability to the claimed invention, that we find a disavowal of that subject matter. Moreover, it is irrelevant whether stainless steel fibers are a preferred embodiment of the claimed invention. We are not here modifying the district court's claim construction to limit its scope to stainless steel fibers. We only modify it to exclude carbon fibers from the scope of the '879 patent claims.

II.

[4] Because Honeywell does not appeal the district court's judgment of lack of literal infringement, we turn to the question whether the accused quick connects infringe under the doctrine of equivalents. Even if the district court correctly construed the "fuel injection system component" limitation, Honeywell argues that the court erred in finding that the accused quick connects do not infringe under the doctrine of equivalents as a matter of law. According to Honeywell, although quick connects do not filter fuel like a fuel filter, the '879 claims do not require that the "fuel injection system component" perform that function. Honeywell contends that the claims only require that the "fuel injection system component" perform the functions of "communicat[ing] fuel to the engine of a motor vehicle," and "provid[ing] an electrically conductive path through said component and [the] electrical plane." Honeywell also asserts that the claims require that the only result needed to be achieved is to "prevent the build-up of electrostatic charge in the fuel and the resultant arcing which causes the breakdown of the polymer material comprising the fuel injection system component." Because, Honeywell argues, the accused quick connects perform these functions in the same way as the fuel filter to achieve the same result, there is infringement.

We agree with the district court that the fuel filter and quick connects are not equivalent devices. They are substantially different. The accused quick connects do not filter fuel. Once we agree with the district court to construe a fuel system component to be a fuel filter, the fuel filter is not merely a limitation of the '879 patent claims. It is central to the patented invention. If one utilizes the conventional function/way/result analysis, it is beyond question that the accused quick connects do not perform the function of the fuel filter. Any equivalent of a fuel filter must necessarily perform the function of fuel filter-filtering fuel-in order to be an equivalent. As Honeywell recognizes in its own brief, "a fuel filter inherently filters fuel." Honeywell Op. Br., at 49.

*9 Having established that any structure equivalent to a fuel filter must substantially perform the function of filtering fuel, we affirm the district court's judgment of noninfringement. Honeywell concedes in its brief, as it must, that the accused quick connects do not perform the fuel filtering function. Honeywell Op. Br., at 47. Thus, no reasonable trier of fact could find that these two structures are equivalent. Given that quick connects do not perform substantially the same function as a fuel filter, there is no need for us to conduct a further analysis of the way that the accused products perform and the result of that performance.

We also conclude that the accused quick connects do not meet, either literally or under the doctrine of equivalents, the "electrically conductive fibers" limitation as we have construed it. There is of course no literal infringement because, as we have held and Honeywell has admitted, a quick connect is not a fuel filter. There can also be no infringement under the doctrine of equivalents because the accused quick connects use carbon fibers, and such fibers were disavowed from the scope of the "electrically conductive fibers" limitation, as we have discussed above. See *J & M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360, 1366 (Fed.Cir.2001) ("The scope of equivalents may [ ] be limited by statements in the specification that disclaim coverage of certain subject matter." *Dawn Equip. Co. v. Ky. Farms, Inc.*, 140 F.3d 1009, 1016 (Fed.Cir.1998)).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 1703376 (C.A.Fed. (Mich.))
(Cite as: --- F.3d ----)

Page 8

## CONCLUSION

Because the accused quick connects do not meet, literally or equivalently, the "fuel injection system component" or "electrically conductive fibers" claim limitations, the district court's grant of summary judgment of noninfringement of the '879 patent in favor of ITT/TG is affirmed.

## AFFIRMED

FN1. The '879 application's independent claim, as originally filed, read as follows:
Moldable material for fuel system components for communicating fuel to the engine of a motor vehicle, said motor vehicle having a common electrical plane maintained at a common electrical potential, said material comprising a polymer material having electrically conductive fibers distributed randomly throughout the material to provide an electrically conductive path through said components between the fuel communicated through said components and said common electrical plane.

C.A.Fed. (Mich.),2006.
Honeywell Intern., Inc. v. ITT Industries, Inc.
--- F.3d ----, 2006 WL 1703376 (C.A.Fed. (Mich.))

Briefs and Other Related Documents (Back to top)

• 2005 WL 3569328 (Appellate Brief) Reply Brief of Plaintiffs-Appellants (Nov. 30, 2005) Original Image of this Document (PDF)
• 2005 WL 3569327 (Appellate Brief) Brief of Defendants-Appellees TG North America Corporation, TG Fluid Systems Usa Corporation, and a. Raymond, Inc. (Oct. 25, 2005) Original Image of this Document with Appendix (PDF)
• 2005 WL 3957184 (Appellate Brief) Brief of Defendants-Appellees ITT Industries, Inc. and ITT Automotive, Inc. (Oct. 25, 2005) Original Image of this Document (PDF)
• 2005 WL 2477437 (Appellate Brief) Opening Brief of Plaintiffs-Appellants (Aug. 31, 2005) Original Image of this Document with Appendix (PDF)
• 05-1407 (Docket) (May 31, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.