THIS DOCUMENT IS CONFIDENTIAL AND FILED
UNDER SEAL. REVIEW AND ACCESS TO THIS
DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COURT
ORDER

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTERNET MEDIA CORPORATION, )<br><br>Plaintiff, )<br><br>v. )<br><br>DELL, INC., )<br>OFFICE DEPOT, INC., )<br>J.C. PENNEY COMPANY, INC., )<br>WILLIAMS-SONOMA, INC., )<br>J. CREW GROUP, INC., )<br><br>Defendants. ) | Civil Action No. 05-633-KAJ<br><br>**REDACTED** |

## PLAINTIFF INTERNET MEDIA CORPORATION'S
## OPENING CLAIM CONSTRUCTION BRIEF

### FILED UNDER SEAL

Thomas P. Preston, Esquire
I.D. No. 2548
**BLANK ROME LLP**
1201 Market Street, Suite 800
Wilmington, DE 19801
Phone: 302-425-6400

*Attorneys for Plaintiff*
*Internet Media Corporation*

OF COUNSEL:
Ronald J. Schutz
Diane L. Simerson
Michael A. Collyard
Andrea L. Gothing
Busola A. Akinwale
**ROBINS, KAPLAN, MILLER &**
**CIRESI, LLP**
2800 LaSalle Plaza
Minneapolis, MN 55402-2015
(612) 349-8500

Dated: July 5, 2006

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ............................................................................1

II.     THE CLAIM CONSTRUCTION ISSUES .....................................1

III.    BACKGROUND .............................................................................4

      A.      The Internet and the World Wide Web ..................................4

      B.      Accessing Content on the Web ..............................................6

      C.      State of the Art at the Time of the Invention .........................8

IV.     The Gagnon patent...........................................................................9

V.      The Accused Technology ...............................................................10

      1.      Dell ......................................................................10

      2.      Office Depot .........................................................11

      3.      J.C. Penney ..........................................................11

      4.      J. Crew .................................................................12

      5.      Williams-Sonoma ................................................12

VI.     Legal Standard of Patent Claim Construction ................................13

VII.    The Disputed Terms and Their Construction .................................16

      1.      Claim 1: "published compilation of preselected Internet
            locations"...........................................................16

      2.      Claim 11: "publishing a compilation of preselected Internet
            locations".............................................................28

      3.      Claim 1 and Claim 11: "unique predetermined multi-digit
            jump code".........................................................29

      4.      Claim 1: "predetermined published Internet location having
            an address published in said published compilation"...................32

      5.      Claim 11: "providing a predetermined Internet location
            having an address published in said published compilation".......37

VIII.   Conclusion......................................................................................38

MP3 20184681.1
000351.00601/40163259v.1

## TABLE OF AUTHORITIES

Page

**Cases**

*ACTV, Inc. v. Walt Disney Co.,*
346 F.3d 1082 (Fed. Cir. 2003) ..................................................................14

*CollegeNet, Inc. v. ApplyYourself, Inc.,*
418 F.3d 1225 (Fed. Cir. 2005) .................................................................14

*Gart v. Logitech, Inc.,*
254 F.3d 1334 (Fed. Cir. 2001) ............................................................13, 15

*Johnson Worldwide Assoc., Inc. v. Zebco, Corp.,*
175 F.3d 985 (Fed. Cir. 1999) ...........................................................14, 35

*Kumar v. Ovonic Battery Co.,*
351 F.3d 1364 (Fed. Cir. 2003) ...............................................................31

*Lava Trading, Inc. v. Sonic Trading Mgmt, LLC,*
445 F.3d 1348 (Fed. Cir. 2006) ...............................................................10

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
358 F.3d 898 (Fed. Cir. 2004) ..............................................15, 23, 27, 34

*Modine Mfg. Co. v. United States Int'l Trade Comm'n,*
75 F.3d 1545 (Fed. Cir. 1996) ...............................................................24

*N. Telecom Ltd. v. Samsung Elec. Co.,*
215 F.3d 1281 (Fed. Cir. 2000) .........................................................15, 21

*Phillips v. AWH Corp.,*
415 F.3d 1303 (Fed. Cir. 2004) ..................13, 14, 16, 19, 22, 23, 30, 34, 35

*Pitney Bowes, Inc. v. Hewlett-Packard Co.,*
182 F.3d 1298 (Fed. Cir. 1999) ..............................................................32

*Rambus, Inc. v. Infineon Techs. AG,*
318 F.3d 1081 (Fed. Cir. 2003) .......................................................15, 23, 26

*SRI Int'l, Inc. v. Matsushita Elec. Corp.,*
775 F.2d 1107 (Fed. Cir. 1985) .........................................................14, 15

*Teleflex, Inc. v. Ficosa N. Am. Corp.,*
299 F.3d 1313 (Fed. Cir. 2002) ...............................................................15

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.,*
442 F.3d 1322 (Fed. Cir. 2006) ...............................................................10

ii

## I.    INTRODUCTION

In this patent infringement action, Internet Media Corporation ("Internet Media") alleges that defendants Dell, Inc. ("Dell"), Office Depot, Inc. ("Office Depot"), J.C. Penney Company, Inc. ("J.C. Penney"), J.Crew Group, Inc. ("J.Crew"), and Williams-Sonoma, Inc. ("Williams-Sonoma") infringe claims of U.S. Pat. No. 6,049,835 ("the 835 patent" or "the Gagnon patent")(Ex. 1)[1]. Specifically, each defendant provides printed materials, such as catalogs and flyers, that include the address of a Web site as well as descriptions related to products and/or services. Some or all of these descriptions include a code that, when entered by a customer into an area on the Web site, links the customer to an Internet location corresponding to the descriptions printed in the catalog or flyer.

On June 14, 2006, the defendant Office Depot submitted a Joint Claim Construction Chart with the parties' proposed constructions of the claim terms in dispute. Now, pursuant to the parties' Joint Stipulation filed on June 28, 2006, Internet Media submits its Opening Claim Construction Brief. A claim construction hearing currently is scheduled for July 25, 2006.

## II.    THE CLAIM CONSTRUCTION ISSUES

The '835 patent consists of twenty claims: two independent claims and eighteen dependent claims. The two independent claims, claims 1 and 11, track each other, with claim 1 being a system claim and claim 11 being a method claim. In response to a request by defendants, Internet Media has agreed to an early claim construction of a few phrases found in claims 1 and 11.

---

[1] All Exhibits cited in Internet Media's Opening Claim Construction Brief are attached to the Declaration of Thomas P. Preston filed herewith.

Claim 1, which is directed toward a system for providing access to preselected Internet locations, reads as follows:

A system for providing automatic access to preselected locations on the Internet, comprising:

**a published compilation of preselected Internet locations,** said published compilation including **a unique predetermined multi-digit jump code** assigned to each of said preselected Internet locations published therein;

**a predetermined published Internet location having an address published in said published compilation,** said predetermined published Internet location including means for capturing a desired multi-digit jump code assigned to each preselected Internet location after said multi-digit jump code has been entered by a user after accessing said predetermined published Internet location;

means for accessing said predetermined published Internet location;

means for receiving said desired multi-digit jump code from said means for capturing and means for converting said received multi-digit jump code to a URL address corresponding to the desired preselected Internet location; and

means for automatically accessing said desired preselected Internet location using said URL address corresponding to said desired preselected Internet location, whereby said user need only enter said desired multi-digit jump code to access a desired preselected Internet location without having to enter said corresponding URL address.

Ex. 1, col. 8, ll. 11-39 (emphasis added). For the purposes of this claim construction, the disputed phrases in claim 1 are as follows:

1.    "a published compilation of preselected Internet locations,"

2.    "a unique predetermined multi-digit jump code," and

3.    "a predetermined published Internet location having an address published in said published compilation."

Like claim 1, claim 11 is also directed toward providing access to preselected Internet locations. Claim 11 provides:

> A method for providing automatic access to preselected locations on the Internet, comprising the steps of:
>
> > **publishing a compilation of preselected Internet locations,** said published compilation including **a unique predetermined multi-digit jump code** assigned to each of said preselected Internet locations published therein;
> >
> > **providing a predetermined Internet location having an address published in said published compilation,** said predetermined Internet location comprising means for capturing a desired multi-digit jump code assigned to said preselected Internet location, said desired multi-digit jump code being entered by a user after said predetermined Internet location has been accessed;
> >
> > accessing said predetermined Internet location and entering said desired multi-digit jump code into said predetermined Internet location;
> >
> > receiving said multi-digit jump code entered into said predetermined Internet location after said multi-digit jump code has been captured at said predetermined Internet location;
> >
> > converting the received multi-digit jump code to a URL address corresponding to the desired preselected Internet location; and
> >
> > automatically accessing said desired preselected Internet location using said URL address corresponding to said desired preselected Internet location corresponding to said received multi-digit jump code.

*Id.,* col. 9, ll. 9-28 (emphasis added). In addition to the disputed phrases from claim 1, for the purposes of this claim construction, the following phrases found in claim 11 are also in dispute:

1. "publishing a compilation of preselected Internet locations" and

2. "providing a predetermined Internet location having an address published in said published compilation."

## III.    BACKGROUND

### A.    The Internet and the World Wide Web

To put the Gagnon patent in context, a preliminary discussion of the Internet and the World Wide Web ("the Web") is helpful. The Internet is a global network of networks through which computers communicate by sending information in the form of packets. Computers on the Internet use a "client-server" model of computing. Typically, this means that one or more remote server computers provide files and/or services to a user's local client computer in response to requests sent by the client computer. No one entity controls the Internet; rather, certain organizations have agreed to set protocols for sending data—e.g., text, programs, images, and sound—over the Internet.

The World Wide Web (the "Web") is the set of information accessible over the Internet via a specific protocol called Hyper Text Transfer Protocol ("HTTP"). Like the Internet, the Web follows the "client-server" model of computing wherein a "client" program sends a request to a program on a "server" computer, which then acts to fulfill the request. An example of a client program is a Web browser, such as Microsoft's Internet Explorer. A server is the computer and software combination that provides the requested information or content to the client software.

While the Internet is often described in spatial terms, it is important to keep in mind that the Internet is not a physical "place" where people travel, but is instead a vast collection of information accessible via computers configured to communicate using specific protocols, such as HTTP. *See, e.g.*, Ex. 2, *Microsoft Press Computer Dictionary* 511 (3rd ed. 1997)(defining "World Wide Web" as the "total set of interlinked hypertext documents residing on HTTP servers around the world"). Therefore, when people speak of Web "sites" or "locations" or "navigating" or "surfing," no one is "at" an Internet site

or "on" the Web. It is information that travels, not people. M.A. Lemley, *Place and Cyberspace*, 91 Calif. L. Rev. 521, 523-24 (2003)("No one is 'in' cyberspace...it is data and not people traveling."). For example, when Microsoft instructs a Web user to "Visit" its Web site "at mspress.microsoft.com," physically, the user does not go anywhere. Ex. 2 at inside cover. It is software on the client computer that sends a request for information to one or more server computers, which in turn provides content to be rendered on the client computer. M.A. Lemley, *Place and Cyberspace*, 91 Calif. L. Rev. 521, 524 (2003)("People may speak of 'visiting' websites, but of course they don't actually do any such thing. They send a request for information to the provider of the website, and the provider sends back data: the web page itself.").

Another important thing to keep in mind when discussing the Web is that due to the limitations of describing the Web in spatial terms, certain words are often used broadly. This is illustrated by the broad use of the ever-present term "Web site." Depending on the context, this term can take on different meanings. For example, as discussed above, when one speaks of "visiting" a Web site, such usage refers to the information or content provided by one or more computers in response to a client request. In contrast, when one speaks of the functionality of a site, for example, the Web site is "down," such usage refers to the one or more programmed computers that provides content. *See, e.g.,* Ex. 3, *Webster's New World Computer Dictionary* 403 (10th ed. 2003)(defining "Web site" as "one or more computers that are associated with a fully qualified domain name and make content available on the Web"); *see also* Ex. 4, *Webster's New World Dictionary of Computer Terms* 546 (6th ed. 1997)(defining "Web

site" as "a computer system that runs a Web server and has been set up for publishing documents on the Web").

### B.    Accessing Content on the Web

The type of information or content available through the Web includes text, images, audio, and video. Ex. 1, col. 1, l. 65-col. 2, l. 3. This content is accessed through the use of a URL (uniform resource locator) address. As its name implies, a URL address is a means to locate a resource on the Web. Ex. 5, *Build a Web Site* 700 (1995)(defining "URL" as a "[a] means for identifying the exact location of a particular resource on the Internet");

Specifically, client-side software such as a Web browser uses a URL address to locate the desired content. Ex. 1, col. 3, ll. 55-60. Examples of URL addresses include the following:

DellEWorks.com (Ex. 9 at

DELL071383);

Web content in the form of Web pages is formatted in a markup language called HyperText Markup Language ("HTML"). With HTML, codes are embedded in an HTML document or Web page so that certain elements (hyperlinks)—such as headlines, images, or important words—are electronically linked to other Web content. Software such as a Web browser permits a Web user to "point and click" on a selected element displayed on a Web page. Using the URL address associated with the selected element, the browser software on the client computer communicates via HTTP with one or more server computers, which in turn provides the requested Web content, which is often, but not always, a Web page. The Web content is then rendered on-screen on the client computer in a manner dictated by the server computer. In addition to using hyperlinks, a Web user

can type the URL address into the address bar of a Web browser to access a desired Web content.

In the case of Web pages, the content often consists of text and images. When the browser accesses the desired content, it actually retrieves information from multiple sources. This is because images are coded as separate links (URL addresses) within the HTML document provided by the Web server. The browser receives the HTML document, renders the text on-screen and, out of view of the Web user, makes a separate request for each image before rendering the images on-screen. Ex. 11, Clinton Wong, *Web Client Programming with Perl* 13-15 (1997). Thus a basic Web page consisting of two images is, in fact, stored as at least three objects: the HTML document containing the text and the image links and the two files containing the images.

Like browsers, when providing Web content, servers can also retrieve information from different sources. Ex. 12, Tittel et al., *Foundations of HTML and CGI* 126 (1995). For example, using a program such as a Common Gateway Interface (CGI) script, a Web server can perform database queries to locate information external to the Web server. *Id.* at 9. Thereafter, that information may be incorporated on-the-fly (dynamically) into a requested HTML document. *Id.* at 9-10, 126-128. The server then passes the requested content to the client computer.

Scripts and programs, such as CGI programs, are commonly used to handle requests made by a Web user through the use of a form. *Id.* at 10. A form is a set of document features coded in HTML that enable a Web user to enter information into a Web page. Ex. 4 at 205-06. A Web server processes the entered information and then returns, for example, a desired Web page or alternatively, a URL that the browser uses to

access the desired Web page. Ex. 13, Helsop et al., *HTML Publishing on the Web* 294-95 (1995).

### C.     State of the Art at the Time of the Invention

At the time of filing of the Gagnon patent, Internet users typically accessed Internet content in one of three ways. First, a user knowing the address of a desired Internet location (such as a newsgroup or Web page) entered the address into client software such as a Web browser or newsreader. For example, entering "www.msn.com" into a Web browser results in the MSN homepage being rendered on a client computer. As the Gagnon patent notes, however, some addresses, such as URL addresses, are strings that are difficult to remember and/or tedious to type. Ex. 1, col. 3, ll. 55-60; col. 7, ll. 10-15. For example, the URL address for the MSN "Children's Health" page is "health.msn.com/pregnancykids/childrenshealth.aspx." Not only is it not practical to memorize such an address, it is not practical to enter it into the browser because the risk of a transcription error is great.

Second, as an alternative to using addresses to access Web content, a Web user employed search engines. Search engines, such as Yahoo!, typically index and store data about Web pages in databases. While some search engines index every word in a Web page, others index only key words. In any event, when a user types keywords into the search engine, the engine looks up the index and provides a listing of the best-matching Web pages, typically with a description containing the page's title and some text. Such a search engine's usefulness, however, depends on the relevance of the results produced. In other words, while there are numerous Web pages and documents that may include a particular word or phrase, some pages are more relevant or desired than others.

Lastly, a Web user could access content through the use of hypertext links. As discussed above, Web pages are embedded with hypertext links (also referred to as "hot links") that permit a user to "jump" from one Web page "to" another. When a Web browser encounters a text hyperlink, it typically highlights the word(s) with a **color** and/or an __underline__. Selecting that text allows the user to access the content of another Internet location, such as a Web page or graphic. Accessing Web content through the use of hyperlinks is not without drawbacks. In particular, if a user wishes to access specific Web content, the user must remember how to get to the desired content. Using the above example, to access the Children's Health page on MSN, a user must click on the following series of links starting from the MSN home page (www.msn.com): 1) Health and Fitness; 2) Pregnancy and Kids; and 3) Children's Health. In short, navigating to desired Web content using hyperlinks can be a multi-step, time-consuming process.

## IV.     THE GAGNON PATENT

The Gagnon patent solved the aforementioned problems associated with: search engines; long and confusing URL addresses; and uncharted series of hyperlinks. For example, the preferred embodiment discloses a published compilation of preselected Internet locations, such as "book 110." Ex. 1, col. 5, ll. 54-61; Figures 1 and 2. This compilation contains descriptions of various preselected Internet locations, "112, 114, 116, 118, 120, 122," and their corresponding multi-digit jump codes, "124, 136, 128, 130, 132, 134." *Id.* The compilation also includes the address for a predetermined published Internet location. A user wishing to access a desired preselected Internet location, first accesses the predetermined published Internet location, for example www.jumpcity.com (*id.*, col. 5, ll. 37-41), and then enters the multi-digit jump code corresponding to the desired preselected Internet location into an on-screen HTML box or form displayed on

the user's computer (*id.*, col. 7, ll. 3-6). Software thereafter converts the code to a URL address, which is then used to access the "desired preselected Internet location." *See e.g., id.*, col. 7, ll. 3-10.

## V.    THE ACCUSED TECHNOLOGY

Knowledge of the accused technology sets forth a "proper context for an accurate claim construction." *Lava Trading, Inc. v. Sonic Trading Mgmt, LLC,* 445 F.3d 1348, 1350 (Fed. Cir. 2006); *see also Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.,* 442 F.3d 1322, 1326-27 (Fed. Cir. 2006) ("[K]nowledge of [the accused] product or process provides meaningful context for the first step of the infringement analysis, claim construction."). In the present case, there are five accused systems, all of which are directed toward providing Internet users with easy access to desired Internet locations through the use of multi-digit jump codes. A detailed description of each of the accused systems is provided below.

### 1.    Dell

As in the claimed invention, Dell's online system uses "multi-digit jump codes" called E-Value codes. "E-value codes have two parts and generally contain five alphanumeric digits followed by five or six alphanumeric digits XXXXX-XXXXXX." Ex. 14 at IMC_PLTF063447. Dell disseminates "published compilation[s] of preselected Internet locations," such as catalogs or other print advertisements. These compilations include one or more product listings with their accompanying E-Value codes. *See, e.g.,* Ex. 15. According to Dell, "With E-Value, a *customer finds a specific system in a Dell print advertisement* or catalog," goes to the Dell Web site, "enters the E-Value code which takes them *directly to that system.*" Ex. 16 at IMC-PLTF063442 (emphasis added); *see also* Ex. 17 (screenshots of Dell Web pages). Put another way, after a customer

REDACTED

"enter[s] the E-value Code, the same system [seen] in [a] catalog will then appear on-screen." Ex. 18 at DELL071336. In short, Dell's E-Value code system saves customers time "by taking them directly to the system they want[.]" Ex. 16 at IMC_PLTF06442. The customer is spared the hassle of typing in long and confusing URL addresses to access the desired Internet location.

### 2.    Office Depot

Office Depot also provides customers with "published compilation[s] of preselected Internet locations," such as catalogs or other print advertisements. These advertisements include one or more product listings and their corresponding "multi-digit jump codes," which Office Depot refers to as "item numbers." *See, e.g.*, Ex. 19 at 7. Office Depot directs customers to "[v]isit www.officedepot.com and enter 9-digit item number(s) in the 'Search Tools' box." *Id.* at 3. When the customer enters the item number in the box as directed, the customer is provided with the desired product page corresponding to the entered item number. *See, e.g.*, Ex. 20 (screenshots of Office Depot Web pages).

By using the "Search Tools" box, the customer accesses a desired page" without having to enter a corresponding URL address.

### 3.    J.C. Penney

J.C. Penney provides its customers with "published compilation[s] of preselected Internet locations." These compilations, which are often catalogs, include product descriptions and their corresponding "multi-digit jump codes," referred to as "item numbers." *See, e.g.*, Ex. 22 at 24 (portion of J.C. Penney Catalog). For online shopping, J.C. Penney directs its customers to its Web site. *Id.* at 25 ("to order jcpenney.com").

REDACTED

That site includes a "shop from our catalogs" box that further directs the customer to enter an item number. Ex. 23 (screenshots of J.C. Penney Web pages). Upon entering an item number, the customer accesses the desired Web page without having to enter a URL address corresponding to that page. *Id.* at 2 (screenshot of J.C. Penney product Web page).

### 4.     J. Crew

Like J.C. Penney, J. Crew also provides customers with "published compilation[s] of preselected Internet locations," such as catalogs or other print advertisements. These print advertisements include multiple product descriptions and their corresponding "multi-digit jump codes," referred to as item numbers. *See, e.g.*, Ex. 24 at 119 (portion of J. Crew Catalog). J. Crew directs its customers to its Web site (*id.*), which includes an "order by item number" option (Ex. 25 (screenshot of J. Crew Web page)). Customers "go directly to a style from [the] catalog simply by entering the item number" in the "order by item number" field. Ex. 26 at JCREW633-003609; *see also* Ex. 24 at 2 (screenshot of J. Crew product Web page). The "order by item number" option spares the customer the aggravation of typing in a long and confusing URL address associated with the desired Web page.

### 5.     Williams-Sonoma

Lastly, like the other named defendants,

Williams-Sonoma lists its products with a corresponding "multi-digit jump code," referred to as a catalog or item number.

*see also*

Ex. 28 (Williams-Sonoma catalog page). Williams-Sonoma directs its customers to visit a

specific Web page, for example "WILLIAMS-SONOMA.COM." *See, e.g.,* Ex. 28. That Web page includes a "SEARCH" box and further instructs the customer to enter a "keyword or item #." Ex. 29 (screenshot of Web page including "SEARCH" box). After a Web user enters the item number, the user is linked to the desired product page corresponding to the item number. *See, e.g.,* Ex. 30 at 2. (screenshot of Williams-Sonoma product Web page).

Williams-Sonoma also has a "catalog quick shop" Web page. Williams-Sonoma directs its customers to visit this page "for easy ordering." *See, e.g.,* Ex. 31 ("For easy ordering, go to **catalog quick shop** at Williams-sonoma.com.")(emphasis in original).

Like the "SEARCH" option, the "catalog quick shop," permits customers to access desired Web pages without having to enter long and confusing URL addresses.

## VI.     LEGAL STANDARD OF PATENT CLAIM CONSTRUCTION

The basic rules governing patent claim construction are straightforward. The first and foremost rule is that patent terms are given their plain and ordinary meaning to one of skill in the art. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-13 (Fed. Cir. 2004). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. In other cases, the meaning of a claim term may not be readily apparent, and the court therefore looks to both intrinsic evidence and extrinsic evidence to determine the ordinary meaning of a claim term. Intrinsic evidence includes the words of the claims, the specification and the prosecution history. *Gart v. Logitech,*

*Inc.*, 254 F.3d 1334, 1339-40 (Fed. Cir. 2001). Extrinsic evidence, in contrast, "consists of all the evidence external to the patent and the prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317.

According to the Federal Circuit, "[q]uite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.*, 415 F.3d at 1314. Indeed, proper claim construction requires interpretation of the entire claim in context, not a single element in isolation. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1090 (Fed. Cir. 2003). "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1314-15. Similarly, general descriptive terms will ordinarily be given their full meaning, and modifiers will not be added to broad terms standing alone. *Johnson Worldwide Assoc., Inc. v. Zebco, Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999).

The second rule governing claim construction is that it is improper to read limitations from the specification into the claims. *Phillips*, 415 F.3d at 1312. While the person of ordinary skill in the art is deemed to read the claim term in the context of the claims as well as the specification (*id.* at 1313), in examining the specification, the court must not at any time import limitations form the specification into the claims (*CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed. Cir. 2005)). As the Federal Circuit has explained,

> [C]laims are infringed, not specifications. . . . If everything in the specification were required to be read into the claims, or if structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims . . . It is the claims that measure the invention.

*SRI Int'l, Inc. v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985)(en banc).

The foundation of this rule is the basic understanding that the law of patenting is intended to be reasonable. In other words, "[t]he law does not require the impossible. Hence, it does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention." *Id.* at 1121. Thus, "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 906 (Fed. Cir. 2004).

The third rule of patent claim construction is that the court should review the prosecution history only to determine if the patentee used a particular meaning for a claim term, or to clarify any remaining ambiguity. *Gart,* 254 F.3d at 1341. Absent these circumstances, the court must presume that the claims mean what they say. *Id.* As with the specification, the prosecution history limits the ordinary meaning of a claim term only where the patentee excludes certain subject matter "with reasonable clarity and deliberateness." *N. Telecom Ltd. v. Samsung Elec. Co.,* 215 F.3d 1281, 1294-95 (Fed. Cir. 2000). In other words, the applicant must use "words or expressions of manifest exclusion or restriction during administrative proceedings before the Patent and Trademark Office" for the prosecution history to demonstrate an applicant's intention to deviate from the ordinary and accustomed meaning of the claim terms. *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1326 (Fed. Cir. 2002); *see also Rambus, Inc. v. Infineon Techs. AG,* 318 F.3d 1081, 1095 (Fed. Cir. 2003). "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than

the final product of that negotiations, it often lacks the clarity of the specification and thus is far less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317.

## VII. THE DISPUTED TERMS AND THEIR CONSTRUCTION

As discussed above, the following claim limitations are in dispute:

- "*a published compilation of preselected Internet locations*" found in claim 1 and the similar language found in claim 11, "*publishing a compilation of preselected Internet locations;*"

- "*a unique predetermined multi-digit jump code*" found in claims 1 and 11; and

- "*a predetermined published Internet location having an address published in said published compilation*" found in claim 1 and the similar language found in claim 11, "*providing a predetermined Internet location having an address published in said published compilation.*"

For each of these disputed phrases, defendants' proposed constructions violate one or more of the foregoing rules of claim construction. Throughout, defendants attempt to avoid the ordinary meaning of the claim terms by importing numerous limitations into the claims. Internet Media's proposed constructions, on the other hand, are based on the ordinary meaning of the terms, supported by the understanding of those in the art, and consistent with the '835 patent specification.

### 1. Claim 1: "published compilation of preselected Internet locations"

The construction of the term "a published compilation of preselected Internet locations" is in dispute. Ex. 32, pp. 1, 23.[2] By improperly importing limitations into the claim, defendants propose an unduly narrow construction of the claim term. In addition,

---

[2] Ex. 32 is a reformatted and updated version of the Joint Claim Construction Chart filed by Office Depot on June 14, 2006, which is attached herewith as Ex. 38.

to the extent defendants' definition of "Internet location" can be determined, it is circular in its reasoning and therefore flawed.

 a)  "Internet location"

 Before defining "published compilation of preselected Internet locations" it is helpful and necessary to define "Internet location." An **"Internet location,"** is **"identified material or subject matter (content) that is provided via the Internet by one or more computers."** As discussed previously and as understood by one of ordinary skill in the art, the Internet and the Web are not physical places.[3] While a person may speak of "visiting" a Web site or other types of Internet locations, the person actually sends a request for information to one or more server computers, which in turn provides the identified material or information to be rendered or processed by the user's computer. *See, e.g.,* Ex. 2 at 506 (defining "Web site" as "[a] group of related HTML documents and associated files, scripts, and databases that is *served* by an HTTP server on the World Wide Web.")(emphasis added). An "Internet location," therefore, is not an actual physical "location" or "place," but rather the identified material or subject matter provided to the Internet user upon request.

 The usage of the term "Internet location" in the '835 patent is consistent with the ordinary meaning. Specifically, the specification provides that any "type of *subject matter* contained on the Internet" can be accessed using the present invention. Ex. 1, col. 6, ll. 1-4 (emphasis added). The subject matter (content) of a "Web site" or "Web page" is one example of an "Internet location" provided for by the present invention. The

---

[3] The specification of the present invention recognizes this basic principle when it provides that "[a] Web site or Web page describes an individual's 'place' on the Web[.]" Ex. 1, col. 3, ll. 29-30 (internal quotations in original). In other words, an Internet "location" is not an actual physical place, but rather a figure of speech.

specification provides that "there is a need for a system which the Web user can use to *access Web sites which contain a substantial amount of original information*, graphics, or multi-media, provide useful advice, news or entertainment, and present information in a well-thought out and professional manner. *Id.*, col. 4, ll. 15-22 (emphasis added); *see also id.*, col. 6, ll. 29-31 ("The selected Web sites preferably *contain a substantial amount of original information*, graphics and multimedia.")(emphasis added). According to the preferred embodiment, "[t]he *information contained* in the selected Web sites is preferably comparable in value and amount to information that is available from traditional, professional created media, such as newspapers and magazines [and] that the *information* available on the selected Web sites be updated on a reasonably frequent basis." *Id.,* col. 6, ll. 31-36 (emphasis added).

In addition to disclosing the subject matter of Web sites and pages as "Internet locations," the patent also discloses the content of newsgroups as "Internet locations." *Id.*, col. 1, ll. 59-63 ("The Internet is also well known for its two other main features, its usenet newsgroups, which constitute thousands of on-line discussion groups covering a wide variety of business, personal, and technical subjects . . . ."). In each case, the "Internet location" is the material or subject matter (content) identified by the Internet user for delivery to the user's computer.

While defendants do not explicitly define "Internet location," it appears from their construction of "published compilation of preselected Internet locations" that defendants' definition of "Internet location" is a "place on the Internet" or an "Internet site." Ex. 32, pp. 1, 23. Taken on its face, these definitions are circular; that is, they define "location" as a "place" or "site" and accordingly provided no guidance as to the meaning of

"Internet location." As discussed above, the Internet and the Web are not physical "places," but rather information to be served via one or more computers to an Internet user.

> **b)** **"a published compilation of preselected Internet locations"**

Internet Media submits that **"a published compilation of preselected Internet locations" is "a disseminated collection of information, such as descriptions, text or graphics, at least some of which correspond to preselected Internet locations."** This construction "involves little more than the application of widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. For instance, a "compilation" is "something," such as information or material, that is "compiled" or collected. Ex. 33 *Merriam Webster's Collegiate Dictionary* 234 (10th edition)(defining "compilation" as "something compiled"); *see also id.* (defining "compile" as "to compose out of *materials from other documents*" or "to *collect* and edit into a volume")(emphasis added). In addition, something is "published" if it is "disseminated" or "released." *Id.* at 944 (defining "publish" as "to *disseminate* to the public" or "to produce or release for distribution")(emphasis added). In view of the foregoing, the ordinary meaning of "a published compilation" is simply "a disseminated collection of information."

In the context of the present invention, the "published compilation" comprises "information, such as descriptions, text or graphics, at least some of which corresponds to preselected Internet locations." *See Phillips*, 415 F.3d at 1315 (stating that claims "must be read in light of the specification, of which that are part"). Broadly speaking, the '835 patent discloses a collection of information, such as a "directory" of Internet locations or sites. Ex. 1, col. 4, ll. 8-9 ("[T]here is a need for a directory of the well-thought out and

useful sites . . . ."); *see also id.,* col. 6, ll. 1-4 (stating that any type of subject matter that can be accessed via a URL can be accessed using the present invention). For example, the written description discloses a collection of information in the form of "printed publication" that includes "reviews" or "descriptions" of Web sites." (Ex. 1, col. 5, ll. 50-61); *id.,* col. 4, ll. 41-43 ("[I]t is an object of the present invention to provide a printed publication containing *descriptions* of selected Web sites . . . .")(emphasis added). This collection of information may include text and/or graphics. *See, e.g., id.,* col. 5, ll. 54-57; Ex. 39, *What's on the Web* 302 (1995)(review of NASA Shuttle Countdown Web page including text and images). In addition, the collection is "disseminated" so that an Internet user easily can determine the jump codes associated with each of the preselected Internet locations. Ex. 1, col. 5, ll. 50-55 ("[I]t is preferable that a printed publication which contains preselected Web sites based on certain criteria be *disseminated* so that the jump codes associated with each of the preselected Web sites can be easily determined by the users.")(emphasis added). Lastly, while the preferred embodiment discloses a compilation of "Web sites," the written description makes clear that the compilation may contain information related to any type of subject matter that can be accessed by means of a URL address. *Id.,* col. 6, ll. 1-4.

In addition to being "published," the claim requires that "Internet locations" included in the "published compilation" be "preselected." *Id.,* col. 8, l. 13. As the language implies, this simply means that the "Internet locations" are *chosen* to be included in "published compilation." *See* Ex. 33 at 1058 (defining "select" as "chosen from a number or group by fitness or preference"). The written description supports this understanding by providing that "the present invention utilizes a published list of

preselected Web sites, which *are selected according to predetermined criteria . . . .*" Ex. 1, col. 4, ll. 53-56 (emphasis added).

In contrast to Internet Media's definition for the claim term "a published compilation of preselected Internet locations," defendants' proposed construction is impermissibly narrow. Defendants Dell, J.C. Penney, J.Crew and Williams-Sonoma argue that "a published compilation of preselected Internet locations" is:

> "a publicly accessible list of different URLs associated with more than one person or entity, each URL corresponding to a different preselected place on the Internet."

(hereinafter referred to as the "Dell *et al.* construction"), Ex. 32 at 1. Defendant Office Depot, in turn, argues that "a published compilation of preselected Internet locations" is:

> "a publically [sic] accessible preselected list of preexisting Websites or other preexisting Internet sites having unique URL addresses, the URL address being associated with diverse individuals or entities."

*Id.* at 23. In both cases, Defendants propose that the Court rewrite the claims to import numerous limitations that are neither present in the claim language nor supported by the intrinsic record.

### (1)     The Dell et al. construction

The first half of the Dell *et al.* construction, which reduces the claim to "a publicly accessible list of different URLs," ignores the language of the claims and is unsupported by the specification. For instance, defendants argue that the compilation must be "publicly accessible." The claim, however, requires only that the compilation be "published." *See N. Telecom,* 215 F.3d at 1290 ("This court has repeatedly and clearly held that it will not read unstated limitations into the claim."). As set forth above, the plain meaning of "published" is "disseminated to the public" or "released for

distribution." Ex. 33 at 944. At no point did the patentee depart from this ordinary meaning. *See Phillips*, 415 F.3d at 1317 ("[O]ur cases recognize that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs."). In the present case, the patentee clearly states that the jump codes are "disseminated." Ex. 1, col. 5, ll. 42-44 ("[T]he only requirement being that the URL be *disseminated* in conjunction with the *dissemination* of the jump codes to be used therewith.")(emphasis added). Therefore, the written description is consistent with the ordinary meaning of "published," and defendants' attempt to alter the plain language of the claim should be rejected.

Defendants' further rewrite the claim language by arguing that the "published compilation" be a "list of different URLs." Ex. 32 at 1 (emphasis added). In doing so, defendants' replace the broad term "compilation" with the narrow term "list" and further limit the phrase "Internet location" to "URL." There are several reasons why such a construction is prohibited.

First, neither the claim language nor the written description support defendants' argument that the claimed "compilation" is merely a "list." As explained above, the ordinary meaning of "compilation" is "something"—such as material or information— that is "compiled" or collected. The ordinary meaning of "list," in contrast, is much more narrow. A "list" is defined as "a simple series of words or numerals (as the names of persons or objects)." Ex. 33 at 680. Defendants' construction, therefore, is at odds with the plain language of the claims.

The written description also provides no support for such a narrow interpretation of "compilation." *See Phillips*, 415 F.3d at 1315 ("[C]laims must be read in view of the specification of which there are part."). Specifically, in addition to disclosing a "list" of Internet locations (*see, e.g.,* Ex. 1, Abstract), as discussed in detail above, the written description also discloses "reviews" and "descriptions" of Internet locations and sites (*id.,* col. 4, ll. 41-43; col. 5, ll. 50-61). This description alone belies defendants' proposed narrow construction. More importantly, even if the written description was limited to a "list," which it is not, defendants' narrow construction ignores the basic tenet of claim construction that, absent a clear disclaimer, claims are not limited to the disclosed embodiment. *Liebel-Flarsheim,* 358 F.3d at 906. As a consequence, defendants' construction is not only at odds with the claim language and the written description, it is contrary to the law.

Second, defendants' position that the claimed "compilation" is a list of "URLs" is even less credible. The claims do not require this limitation. *See Rambus,* 318 F.3d at 1089 ("Nothing in the claim language indicates that 'integrated circuit device' necessarily includes a device identification register, interface circuitry, and comparison circuitry."). In fact, the claim language demonstrates that the patentee purposely did not limit his compilation to "URLs," because the term "URL address" appears later in the very same claim. *See Phillips*, 415 F.3d at 1314 ("[T]he context in which a term is used in the asserted claim can be highly instructive."). Had the patentee intended to limit his invention to a "list of different URLs," he would have claimed such a list. He did not, and as a result, defendants' position that the "published compilation" is merely "a list of different URLs" finds no support in the claims.

And again, the written description does not support defendants' narrow construction. As disclosed in Figures 1 and 2, the "published compilation" of the preferred embodiment includes descriptions of Web sites "112, 114, 116," etc., and their corresponding multi-digit jump codes "124, 126, 128," etc. Nowhere in Figure 1 or 2 is a URL address disclosed, let alone required. As the written description makes clear, "[t]here is no need to *determine*, nor input, the URL address of the Web site which is desired to be accessed." Ex. 1, col. 5, ll. 65-67 (emphasis added); *see also id.*, col. 6, ll. 60-63 ("The only URL the user need ever input in order to access any of the preselected (and best available) Web sites in the publication 110 is the URL of the JumpCity Web site."). Accordingly, a construction requiring that the claimed "published compilation" include URL addresses necessarily excludes the preferred embodiment as shown in Figure 1. Such a construction is clearly flawed. *Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Cir. 1996)("Indeed, a claim interpretation that would exclude the inventor's device is rarely the correct interpretation; such an interpretation requires highly persuasive evidentiary support . . . ."). In short, the Dell *et al.* construction frustrates the very purpose of the invention, namely, to avoid "tedious and confusing entry of URLs." Ex. 1, col. 7, ll. 10-15.

The second half of the Dell *et al.* construction, which requires that "URLs" be "associated with more than one person or entity," also lacks merit. Ex. 32 at 1. Insofar as defendants' construction can be understood, defendants suggest that the invention cannot be used to access just any Internet location, but rather must be used to access Internet locations, at least some of which are owned or operated by distinct entities. Again the claim does not include this language, nor does the specification require it. Instead, the

specification provides that "in addition to Web sites, *any other information contained on the Internet which has a URL*, can be accessed using the jump code provided therefore." Ex. 1, col. 6, ll. 1-4 (emphasis added). In other words, any information that can be accessed by means of a URL address can be accessed using the present invention. There is nothing in the specification that suggests, let alone requires, otherwise.

This point is further underscored by the embodiment related to accessing Web content. Specifically, dependant claim 5 provides "wherein said preselected locations on the Internet are *in* the World Wide Web." *Id.*, col. 8, ll. 50-51 (emphasis added). From the plain language of the claim, the only requirement is that the Internet locations be "in" the Web. There is no requirement that the locations be associated with any particular person or entity.

There is more. The Background of the Invention, which sets forth traditional methods of navigating the Internet (such as URL addresses and hyperlinks), makes clear that an Internet user can "jump" within a site or "jump" outside of a site. *Id.*, col. 3, ll. 44-48 ("Any single Web site may contain dozens, hundreds, or even thousands of hot links, both to other sections *within the same site or to other Web sites* located anywhere in the world.")(emphasis added). Because the present invention provides an alternative to these traditional methods of navigation (*id.*, col. 3, l. 39 –col. 4, l. 7), the patent logically is not limited to navigating to Internet locations "associated with more than one person or entity." Accordingly, the Dell *et al.* construction is at odds with the plain language of the claims and the written description.

### (2)    *The Office Depot construction*

As with the Dell *et al.* construction, at every turn, Office Depot adds unstated and unsupported limitations into the language of the claim. Like the other named defendants, the first limitation Office Depot adds to the claims is "publicly accessible." Specifically, Office Depot requires that the published compilation be a "*publically [sic] accessible preselected list of preexisting Web sites and other preexisting Internet sites . . . .*" Ex. 32 at 23 (emphasis added). For the same reasons set forth above regarding the Dell *et al.* construction, Office Depot's unstated limitation ignores the ordinary meaning of "published" as well as the language set forth in the written description. It therefore should be rejected.

Office Depot further rewrites the claim to add a second and third limitation by requiring that the "compilation" be a "preselected list." Ex. 32 at 23. For the same reasons set forth above regarding the Dell *et al.* construction, Office Depot's attempt to limit the term "compilation" to a "list" is unsupported by the claims, the written description and controlling case law.  In addition, while it is unclear what Office Depot means by "*preselected* list," the only time this word "preselected" appears in the claims or the written description in reference to "Internet locations" and "Web sites." Thus, this limitation too should be discarded. *See Rambus,* 318 F.3d at 1088 (reiterating that unstated limitations should not be read into the claim language).

Office Depot does not stop there. Office Depot further rewrites the claim to add a fourth limitation. Specifically, Office Depot replaces "preselected, "which modifies "Internet location," with "pre-existing." Ex. 32 at 23. Again, it is unclear why Office Depot inserts this unstated limitation into the claim. What is clear, however, is that the

term "pre-existing" does not mean "preselected." *Compare* Ex. 33 at 918 (defining "preexist" as "to exist earlier or before") *with, id.* at 1058 (defining "select" as "chosen from a number or group by fitness or preference"). What is more, "pre-existing" appears nowhere in the written description. Rather, consistent with the meaning of "selected," the written description provides that "the present invention utilizes a published list of preselected Web sites, which *are selected according to predetermined criteria* . . . ." Ex. 1, col. 4, ll. 53-56 (emphasis added).

To the extent that Office Depot is suggesting that the claim does not cover Internet locations or Web pages generated "on-the-fly" or "dynamically," such a suggestion is contrary to the claim language and more importantly, it is divorced from the written description of the patent-in-suit. As was well-known in the art and set forth in the written description, Internet locations in the form of Web sites or Web pages are accessed by means of a URL address. *Id.,* col. 3, ll. 52-55. The written description further provides that URL addresses include "files or *executable commands*...which must be typed into the user's Web browser exactly as they appear...in order to go to a Web site." *Id.,* col. 3, ll. 55-59 (emphasis added). As explained in Section II above, at the time of the invention, such executable commands (scripts) were commonly used to generate Web pages "dynamically" (on-the-fly). *See* Ex. 12 at 9 ("Today, dynamically created hyperdocuments are the rage."). Accordingly, any suggestion that the patentee disclaimed "dynamically" generated Internet locations or Web pages is contrary to the claims as well as the written description. *See Liebel-Flarsheim,* 358 F.3d at 906 ("[T]he claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention

to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'").

Adding a sixth limitation, Office Depot requires that the "pre-existing Websites and other pre-existing Internet sites" have "unique URL addresses." Ex. 32 at 23. In other words, according to Office Depot, each "pre-existing Web site" or "pre-existing Internet site" can have one and only one URL address. As with Office Depot's other proposed limitations, this language is not found in the claim, nor is it found in the specification. Moreover, it is well-known in the art that multiple URL addresses can map to the same Internet location. *See, e.g.*, Exs. 36 and 37 (screenshots of the same Web site corresponding to the Office Depot addresses "techdepot.com" and "solutions4sure.com," respectively). Accordingly, this unstated and unsupported limitation should be rejected.

Finally, Office Depot's construction adds yet a seventh limitation to the claim language by requiring that the claimed Internet locations have "URL addresses" that are "associated with diverse individuals or entities." Ex. 32 at 23. Put another way, like the other named defendants, Office Depot suggests that the invention cannot be used to access just any Internet location; rather, it must be used to access Internet locations "associated with diverse individuals or entities." And again, for the same reasons set forth above regarding the Dell *et al.* construction, Office Depot's construction is contrary to the plain language of the claims and unsupported by the record. Accordingly, it too should be rejected.

2.    **Claim 11: "publishing a compilation of preselected Internet locations"**

The parties dispute the meaning of "publishing a compilation of preselected Internet locations." Ex. 32, pp. 12, 31. For the same reasons set forth above in section 1

for the term "a published compilation of preselected Internet locations," **"publishing a compilation of preselected Internet location"** takes on its ordinary meaning and means **"publishing or disseminating a collection of information, such as descriptions, text or graphics, at least some of which correspond to preselected Internet locations."** And for the same reasons set forth above in the preceding section, defendants' proposed construction for "publishing a compilation of preselected Internet locations" is improperly narrow, reads multiple unstated and unsupported limitations into the claims, and as a result, should be discarded.

     **3.**    <u>Claim 1 and Claim 11</u>: **"unique predetermined multi-digit jump code"**

The phrase **"a unique predetermined multi-digit jump code,"** as its name implies, is a **"unique predetermined code consisting of more than one digit and used to access an Internet location."** As used in the claim, the term "code" takes on its ordinary meaning as "a system of symbols (as letters or numbers) used to represent assigned and often secret meanings." Ex. 33 at 221. The term "jump," which modifies the term "code," is used to describe the purpose of the code, that is, to access (or move to) an Internet location. *Id.* at 634 (defining "jump" as "an act of jumping," for example, "a transfer from one sequence of instructions in a computer program to a different sequence"); *see also* Ex. 1, col. 3, ll. 49-50 ("Some Web pages also include a links page or *jump* site which consist of links to many other Web sites.")(emphasis added); Ex. 34[4] at IMC_PLTF 061763, cited U.S. Pat. No. 5,572,643, col. 4, ll. 56-60 ("There are numerous link tags in HTML to enable the viewer of the document to *jump* to another place in the same document, to *jump* to the top of another document, to *jump* to a specific

---

[4] Exhibit 34 is a portion of the File History of the '835 patent. The full File History was provided to the Court on June 8, 2006, as Exhibit 2 to the Joint Claim Chart filed by Internet Media.

place in another document, or to create and jump to a remote link (via a new URL) to another server.")(emphasis added). The modifier "multi-digit" indicates that the "jump code" consists of more than one letter or number, while the modifier "unique" demonstrates that the "multi-digit jump code" is unique within the published compilation. In other words, within the published compilation one "jump code" is assigned to no more than one "Internet location." Finally, the claim requires that the "jump code" be "predetermined," that is, determined in advance of publication of the compilation.

In contrast, defendants define "unique predetermined multi-digit jump code" as "a different predetermined number consisting of more than one digit." Ex. 32 at 5. Not only is this definition improperly narrow, it conflicts with the plain language of the claims. Moreover, defendants' inclusion of the term "different" in their proposed construction provides no additional insight into the meaning of the term. In other words, defendants do not specify from what the "predetermined number" is different.

In their proffered construction, defendants equate the claim term "code" with "number." This definition is not consistent with the ordinary meaning of the word "code" (Ex. 33 at 221), and more importantly, it ignores the plain language of the claims. As the Federal Circuit has explained, evidence as to the scope of a particular claim can be found by review of other claims. *Phillips*, 415 F.3d at 1314-15. Under the doctrine of claim differentiation, dependant claims are presumed to be of narrower scope than the independent claims from which they depend. *Id.* In the present case, while claim 1 recites a "unique predetermined *multi-digit jump code*," dependant claim 9 recites "the system of claim 1, wherein said *multi-digit jump code* is a *four digit number*." Ex. 1, col. 8, claims 1 and 9 (emphasis added). Because the term "number" does not appear in the independent

claim, the term "jump code" is presumed to have a different meaning than "number." Further underscoring this point is the fact that had the patentee wanted to limit the term "multi-digit jump code" to a code consisting of numbers only, in claim 1, he would have claimed a "multi-digit number" or simply a "number." He did not. Similarly, had the patentee even arguably considered "code" to be limited to numbers, claim 9 would recite—at a minimum—a "four digit code," not a "four-digit number." It does not. Ultimately, it is clear from the claim language that the patentee used the term "multi-digit" to represent the quantity of symbols in the claimed "code."

Further evidence that the term "digit" is not limited to numbers is found elsewhere in the intrinsic record. Specifically, U.S. Pat. No. 5,804,803 to Cragun *et al.*, which was cited during the prosecution of the patent-in-suit, confirms an understanding of the term "digit" that includes letters as well as numbers. *See, e.g.,* Ex. 34 at IMC-PLTF 061529, col. 6, ll. 10-12 (referring to Figure 2 and stating that "the first eight hexadecimal digits [1A2B3C4D] are converted by processing program 110 to a 32-bit number"); *see also id.* at IMC_PLTF 061531, col. 10, ll. 44-45. This art, which is considered intrinsic evidence (*Kumar v. Ovonic Battery Co.*, 351 F.3d 1364 (Fed. Cir. 2003)("Our cases also establish that prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence.")), is particularly useful because it demonstrates an understanding of the term in the relevant art at the time of the '835 patent. This understanding conflicts with defendants' proffered construction.

Moreover, defendant Dell's ordinary usage of the term "digit" is in stark contrast to defendants' now-proffered construction. Dell describes its "multi-digit jump codes," referred to as E-value codes, as follows:

> "E-value codes have two parts and generally contain *five alphanumeric digits* followed by *five or six alphanumeric digits* XXXXX-XXXXXX."

Ex. 14 (emphasis added). An example of an E-value code is found in Exhibit 15, which lists the E-Value code for the Dimension 2400 computer as "*6F899-D50802V.*" (emphasis added). Dell's usage of the term confirms that the term "digit" includes both numbers and letters. This evidence is extremely trustworthy because it provides a pre-litigation understanding of the term. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308-09 (Fed. Cir. 1999)("[I]t is entirely appropriate, perhaps even preferable, for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field."). Thus now, not only do defendants ignore the plain language of the claims and the intrinsic record, defendants proffer a construction in direct conflict with defendant Dell's own usage of the term in the relevant art.

### 4.    Claim 1: "predetermined published Internet location having an address published in said published compilation"

The parties dispute the meaning of a "predetermined published Internet location having an address published in said published compilation." Ex. 32 at 9. As with defendants' other proposed constructions, in an effort to avoid infringement, defendants improperly import unsupported limitations into the claim.

As discussed above, the term **"Internet location"** means **"identified material or subject matter (content) provided via the internet by one or more computers."** *Supra* section 1. With this definition in mind and read in the context of the specification and the claims, **"a predetermined published Internet location having an address published in said published compilation"** is, as its name implies, a **"predetermined Internet**

**location having an address published in said published compilation.**" As an example of a predetermined Internet location, the specification discloses a Web site for receiving multi-digit jump codes. Ex. 1, col. 4, ll. 61-62. In the context of the preferred embodiment, the predetermined Internet location is "preferably a Web site called JumpCity. Ex. 1, col. 5, ll. 37-38.

The predetermined Internet location is "published" in the sense that it has a published "address." As the claim term provides, this "address" is published in the "published compilation of preselected internet locations." Ex. 1, col. 8, ll. 18-19. The term "**address**" is widely used in the Internet industry and means "**a designation for a particular Internet location.**" Ex 2 at 17 (defining "address" as "[a] name or token specifying a particular site on the Internet or other network."). This definition is consistent with the lay definition of "address" as the location at which a person or organization can be found, yet while "address" in the everyday sense of the word specifies the physical location of the subject matter, in the context of the Internet, the subject matter to be located is the identified material (content) provided via the Internet by one or more computers.

In the context of the Gagnon patent, the ordinary meaning of "address" applies. That is, an "address" is "a designation for a particular Internet location." For example, the preferred embodiment provides that the URL address for the predetermined Internet location "be disseminated in conjunction with the dissemination of the jump codes to be used therewith." Ex. 1, col. 5, ll. 42-44. Consistent with the ordinary meaning of "address," the address disclosed in the preferred embodiment provides "directions"—in

other words is a "designation"—to be used by a user to access or "visit" the "predetermined published Internet location."

Not surprisingly, defendants again propose a particularly narrow construction of "a predetermined published Internet location having an address published in said published compilation." Defendants argue that the claim term means "a publicly accessible predetermined place on the Internet having a URL published in said published compilation and providing access to other places on the Internet associated with other persons or entities." Ex. 32 at 9. Defendants therefore propose that the Court rewrite the claim to insert "publicly accessible," replace "address" with the term "URL," and add the limitation that the predetermined Internet location "provide access to places on the Internet associated with other persons or entities." In doing so, defendants commit "one of the cardinal sins of patent law"—reading unstated limitations into the claims. *Phillips,* 415 F.3d at 1320.

Regarding the term "address," the preferred embodiment provides that the "specialized Web site is preferably a Web site called JumpCity, which has a URL of http://www.jumpcity.com ...." Ex. 1, col. 5, ll. 37-40. Seizing upon this language, defendants argue that the claim term "address" is limited to a "URL." Ex. 32 at 9. The Federal Circuit, however, "has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Liebel-Flarsheim,* 358 F.3d at 906. More specifically, claims are not read restrictively unless the patentee has demonstrated a clear intention to limit the claim using words of "manifest exclusion or restriction." *Id.* In the present case, no such

disclaimer can be found. There is simply nothing in the intrinsic record that constitutes a clear intention to limit "address" to "URL."

In addition and of critical significance, in the present case, the patentee could have easily claimed "a predetermined Internet location having a *URL* or *URL address* published in said published compilation." Indeed, the term "URL address" is recited in the very same claim. Ex. 1, col. 8, ll. 30-31. The claim language alone, therefore, belies defendants' position that "address" means "URL" or "URL address." In short, the Court must presume the terms in the claim mean what they say, and here, the claim says "address." *Johnson Worldwide Assocs.*, 175 F.3d at 989 ("In short, a court must presume the terms in the claim mean what they say, and, unless otherwise compelled, give full effect to the ordinary and accustomed meaning of claim term.").

Lastly, in addition to importing "URL" into the claim, defendants further rewrite the claim to require that the predetermined Internet location "provide access to other places on the Internet associated with other persons or entities." Ex. 32 at 9. In other words, in an attempt to avoid infringement, defendants argue that invention cannot be used to access just any Internet location or Web page. Rather, the invention must be used to "jump to" or access pages associated with an entity separate and apart from the entity associated with the "predetermined Internet location." There are several reasons why this argument fails.

First, it cannot be overstated that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312. In the present case, not only is the defendants' limitation not found in the claims, the language of the claims clearly demonstrate that the present invention is not limited to accessing

"other places on the Internet associated with other persons or entities." For example, in the context of the Web, dependant claim 5 provides "wherein said preselected locations on the Internet are *in* the World Wide Web." Ex. 1, col. 8, ll. 50-51 (emphasis added). From the plain language of the claim, the only requirement is that the Internet locations be "in" the Web. There is no requirement that the locations be associated with any person or entity.

Second, there is no support in the written description for defendants' additional limitation. Rather, the specification broadly provides that "in addition to Web sites, *any other information contained on the Internet which has a URL,* can be accessed using the jump code provided therefore." *Id.*, col. 6, ll. 1-4 (emphasis added). In other words, any information that can be accessed by means of a URL address can be accessed using the present invention. There is nothing in the specification that suggests, let alone requires, otherwise.

Finally, defendants' proposed limitations ignore the purpose of the present invention. As set forth in the Background of the Invention, one of the purposes of the present invention is to provide an alternative to traditional tools, such as URL addresses and hyperlinks (hot links). *Id.*, col. 3, l. 39 –col. 4, l. 12; *see also id.*, col. 4, ll. 31-35. The written description further provides that, using traditional tools such as hyperlinks, an Internet user can "jump" *within* the same site or to another Web site. Ex. 1, col. 3, ll. 45-47 ("Any single Web site may contain dozens, hundreds, or even thousands of hot links, both to other sections *within the same site or to other Web sites* located anywhere in the world.")(emphasis added). By providing an alternative to these traditional methods, the present invention therefore encompasses accessing content within the one site or between

sites. Ultimately, the present invention is concerned with easy access to "selected beneficial sites or addresses." *Id.*, col. 4, ll. 27-30. It is not directed, as defendants' argue, towards accessing sites owned or operated by any particular entity.

> 5.  Claim 11: "providing a predetermined Internet location having an address published in said published compilation"

The parties also dispute the meaning of "providing a predetermined Internet location having an address published in said published compilation." Ex. 32 at 18. In accordance with the ordinary meaning, Internet Media submits that "**providing a predetermined Internet location having an address published in said published compilation**" means "**providing a predetermined Internet location having an address published in said published compilation, wherein providing means supplying.**" *See* Ex. 33 at 940 (defining "provide" as "to supply or make available."). For the same reasons set forth above in section 4, "**a predetermined Internet location having an address published in said published compilation**" is, as its name implies, "**a predetermined Internet location having an address published in said published compilation,**" wherein the term "**address**" takes on its ordinary meaning as "**a designation for a particular Internet location.**"

For their construction of this claim term, defendants rely on their definition for "a predetermined Internet location having an address published in said published compilation." Ex. 32 at 18. As discussed in detail above in section 4, defendants' construction for this term is improperly narrow. For instance, defendants argue that the "predetermined Internet location" must be "publicly accessible." Yet this language is not found in the claims or the written description. Defendants further argue that the term "address" is limited to a "URL" address. But again, as discussed in section 4, this

limitation is at odds with the plain language of the claims, the written description and controlling case law. Lastly, defendants argue that the "predetermined Internet location" must provide "access to other places on the Internet associated with other persons or entities." Ex. 32 at 18. As also explained in section 4, this limitation is contrary to the claims and ignores the purpose of the invention, namely to provide easy access to *any* Internet location. Accordingly, like defendants' other proposed constructions, this construction too should be rejected.

## VIII.   CONCLUSION

For the stated reasons discussed above, Internet Media's proposed construction of the disputed claim terms should be adopted. These constructions are as follows:

| Claim language | Construction |
|---|---|
| a published compilation of preselected Internet | a disseminated collection of information, such as descriptions, text or graphics, at least some of which correspond to preselected internet locations, wherein "internet location" is identified material or subject matter that is provided via the internet by one or more computers |
| publishing a compilation of preselected Internet locations | publishing or disseminating a collection of information, such as descriptions, text or graphics, at least some of which correspond to preselected Internet locations |
| unique predetermined multi-digit jump code | unique predetermined code consisting of more than one digit used to access an Internet location |
| predetermined published Internet location | predetermined Internet location having an address published in said published compilation, wherein "address" is a designation for a particular Internet location |
| providing a predetermined Internet location having an address published in said published compilation | providing a predetermined Internet location having an address published in said published compilation, wherein "address" is a designation for a particular Internet location and "providing" means supplying |

*Of Counsel:*

Ronald J. Schutz
Diane L. Simerson
Michael A. Collyard
Andrea L. Gothing
Busola A. Akinwale
ROBINS, KAPLAN, MILLER &
CIRESI, LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
(612) 349-8500

Dated: July 5, 2006

BLANK ROME LLP

*/s/ Thomas P. Preston*

By: _____
Thomas P. Preston, Esquire, #2548
Chase Manhattan Centre
1201 Market Street, Suite 800
Wilmington, DE 19801
Ph: (302) 425-6478
Fax: (302) 425-6464

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, Thomas P. Preston, hereby certify that on the 5th day of July, 2006, I served

**PLAINTIFF INTERNET MEDIA CORPORATION'S OPENING CLAIM**

**CONSTRUCTION BRIEF (FILED UNDER SEAL)** on the following counsel:

**BY ELECTRONIC SERVICE**

Richard L. Horwitz, Esquire
David E. Moore, Esquire
**Potter Anderson & Corroon LLP**
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19899-0951

**BY FEDERAL EXPRESS**

Willem G. Schuurman, Esquire
David B. Weaver, Esquire
Kristen P. Foster, Esquire
Matthew S. Wermager, Esquire
David Killough, Esquire
**Vinson & Elkins L.L.P.**
2801 Via Fortuna, Suite 100
Austin, TX 78746-7568

**BY ELECTRONIC SERVICE**

Titania R. Mack, Esquire
Michael Nicodema, Esquire
Ben Zuckerman, Esquire
**Greenberg Traurig, LLP**
The NeMours Building
1007 N. Orange Street, Suite 1200
Wilmington, DE 19801

**BY FEDERAL EXPRESS**

Gaston Kroub, Esquire
**Greenberg Traurig LLP**
Metlife Building
200 Park Avenue
New York, NY 10166

**BY ELECTRONIC SERVICE**

Philip A. Rovner, Esquire
**Potter Anderson & Corroon LLP**
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE 19801

**BY FEDERAL EXPRESS**

James G. Gilliland, Jr., Esquire
Gregory S. Gilchrist, Esquire
April E. Abele, Esquire
**Townsend and Townsend and Crew LLP**
Two Embarcadero Center, 8th Floor
San Francisco, CA 94111

060351.00601/40163247v.1

**BY FIRST-CLASS MAIL**

Kayla Carter Owens, Esquire
**J. C. Penney Corp., Inc.**
Plano, Texas 75075

*/s/ Thomas P. Preston*

Thomas P. Preston
I.D. No. 2548